54 CCPA

**Alvin L. BREEN and Herbert G. Lauterbach, Appellants,**

**v.**

**Alfred RICHMOND, Robert Albert King and Alexander Henderson Gentle, Appellees.**

**Patent Appeal No. 7520.**

United States Court of Customs and Patent Appeals.

Oct. 6, 1966.

A. Newton Huff, Norris E. Ruckman, Wilmington, Del. (Frederick Schafer, Washington, D. C., of counsel), for appellants.

Caspar C. Schneider, Jr., New York City, William A. Smith, Jr., Washington, D. C., for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

The Board of Patent Interferences awarded priority to Richmond et al. (hereafter Richmond), and Breen et al. (hereafter Breen) appealed. Two principal issues are before us for determination. (1) Was Richmond's motion to shift the burden of proof properly granted? (2) If the first issue is resolved in favor of Richmond, did Breen establish an actual reduction to practice prior to the date accorded to Richmond for a constructive reduction to practice?

The interference was declared as to common subject matter in two pending applications. Claim 23, which became the

single count herein, originated in Breen's application.[1] It was suggested by the examiner for purposes of the interference and was copied in Richmond's application.[2] The Breen application is assigned to E. I. du Pont de Nemours and Company. The Richmond application is assigned to British Celanese Limited.

Background material for understanding the technical aspects of the invention in issue is found in the Breen application which states:

This invention relates to a process for treating a bundle of filaments such as yarn or thread to produce a multifilament yarn of greatly increased bulk and to the novel bulky yarn produced. More particularly, the invention relates to a bulky yarn composed of a plurality of substantially continuous individually crimped filaments having a random three-dimensional curvilinear configuration and improved level dyeing characteristic and faster dyeing rate and to the process used for preparing such yarn.

Artificial fibers are normally produced most easily as continuous filaments. These continuous filament yarns are very strong because of the absence of loose ends that are unable to transmit imposed stresses. Their extreme uniformity and lack of discontinuity, however, makes conventional continuous synthetic filament yarns much more dense than yarns made from synthetic staple fibers. The production of yarn from staple fibers, however, is time consuming and requires a complex series of operations to crimp the fibers, align the fibers into an elongated bundle and then to draw the bundle to successively smaller diameters. The final spinning operation, which involves a high degree of twist, finally binds these discontinuous fibers together to produce a coherent yarn with considerably increased bulk. The occluded air spaces give them a light-

ness, covering power, and warmth-giving bulk not normally possible with continuous filament yarns. Thus to get staple fibers that can be processed on conventional wool or cotton spinning equipment, it has been the practice to cut continuous filament yarns such as rayon, acetate, nylon, as well as the polyacrylic and polyester fibers into short lengths for spinning into staple yarn.

Recent developments in the textile industry have provided useful routes for improving the bulk and covering power and recoverable elongation of continuous filament yarns without resorting to the staple spinning systems of the prior art. A well-known process for making stretch yarn involves the steps of twisting, heat-setting and then backtwisting to a low final twist level. Another yarn of improved bulk is prepared commercially by the steps of twisting, heat-setting and backtwisting on-the-run using a false-twisting apparatus. This end product can be further modified by hot relaxing to improve the bulk and handle. Still another bulk yarn is being prepared by the well-known stuffer box technique wherein the yarn is steamed to heat-set while it is in a compressed state in the stuffer box.

All of these yarns of the prior art are produced by a process which has the common elements of deforming the yarn mechanically and then heat-setting either with or without an after-relaxation step. * * *

After discussing the "recently disclosed product" of the Breen U.S. Patent No. 2,783,609, issued Mar. 5, 1957, Breen set forth the objects of the invention here in issue as follows:

It is an object of the present invention therefore to provide continuous filaments and continuous filament yarn having a bulkiness greater than staple yarn spun from comparable fibers.

1. Ser. No. 698,103, filed Nov. 22, 1957, for "Textile Product and Process for Making the Same."

2. Ser. No. 714,601, filed Feb. 11, 1958, for "Production of Voluminous Yarn."

Another object is to provide multifilament yarn resembling spun staple in its desirable lightness, covering effectiveness and warmth-giving bulk but retaining the characteristic continuous filament freedom from loose ends, fuzziness and pilling. A further object is to provide a process for preparing continuous filament yarn having a bulk greater than that of comparable staple yarn without abrading or cutting the constituent filaments. A still further object is to provide a process which is suitable for rapidly and economically treating ordinary multifilament continuous yarn to greatly increase the bulk without the use of moving mechanical parts other than in the windup. It is also an object to prepare a bulky filamentary material especially useful for the pile component of pile fabrics. Other objects include the provision of continuous filament yarn having greater bulk than staple yarn together with increased uniformity of dyeing rate with low elongation and very low pilling tendency. * * *

The single count reads as follows:

The process of imparting a persistent crimp to synthetic linear polymeric filaments and yarns which comprises feeding the same to a plasticizing stream of a compressible fluid having a temperature of at least 300° F. in which the individual filaments, while in a plastic state and under substantially zero tension, are separated from each other and crimped individually while whipping about in the turbulent plasticizing stream, the crimp having a random, three-dimensional, curvilinear, extensible configuration, and setting the crimp thereby imparted to the said filaments.

The count and its relation to the issues here is best understood when broken down into its component parts. Breen and Richmond agree in general as to the importance of such a breakdown but in doing so emphasize different portions of the count as being the critical factors therein. Thus Breen emphasizes that the count covers a two step *"process"* for imparting persistent crimp to synthetic linear polymeric filaments and yarns. These steps being (1) *"feeding"* the filament to a stream of compressible fluid having a temperature of at least 300° F. and (2) *"setting"* the crimp imparted to the filaments in the stream.

Richmond, however, emphasizes other portions of the count and interprets it as requiring:

1. that the synthetic linear polymeric filaments be fed into a gaseous stream which
   a. *is turbulent,*
   b. *has a temperature of at least 300° F.,* and
   c. *is capable of plasticizing* the filaments.
2. that, while "whipping about" in this stream, the filaments are
   a. *rendered plastic,*
   b. *separated from one another,* and
   c. *crimped individually;* and
3. that the crimp so imparted is
   a. *random,*
   b. *three-dimensional,*
   c. *curvilinear,* and
   d. *extensible;*
4. that the crimp is then set.

Various prior patents as well as Breen's Australian patent No. 161,076 were cited by the Patent Office as references against both applications. It is Richmond's position that these references show the broad two step process of *feeding* the filament and *setting* a crimp therein was old. The position taken in Richmond's brief is:

* * * The count is patentable *only* by virtue of the nature of the gas stream (over 300° F., turbulent and plasticizing), the behavior of the filaments (they are separated and individually crimped while "whipping about" in the plasticizing stream), and the nature of the crimp (random, three-dimensional, curvilinear and extensible). * * *

■ As originally declared, Breen was senior party in the interference. Richmond's motion to shift the burden of

proof was granted and the interference proceeded to issue with Richmond in the senior party position by reason of a priority claim under 35 U.S.C. § 119 based on a corresponding British Provisional Specification No. 6,876 of 1957, filed in Great Britain on March 1, 1957. Breen opposed the granting of this motion before the examiner and before the Board of Patent Interferences and assigns it as error here. It is Breen's contention that Richmond's British Provisional Specification does not support the count in interference. The British application is substantially the same as the Richmond application in interference except for the addition of examples IV and V in the latter, and upon which there has been no reliance by the Patent Office in resolving the issue against Breen.

We shall first consider this issue. It is stated in Breen's brief that:

> There is no disclosure in the Richmond et al. British application of the following limitations of the Count:
>
> 1. "imparting a persistent crimp" by means of a turbulent plasticizing stream in which the individual filaments
>
> 2. "while in a plastic state"
>
> 3. "and under substantially zero tension" are separated and crimped individually, and
>
> 4. "the crimp having a random, three dimensional, curvilinear, extensible configuration."

In stating this position, it will be seen that Breen is reading the count in substance in much the same manner as Richmond contends it should be read when evaluating Breen's proofs as to an earlier actual reduction to practice.

Each of the above limitations in the count was considered by the examiner and his decision that the count was supported by the British application was affirmed by the board. Their reasoning and conclusions on these reasons have been fully reviewed. For the reasons stated by the board, we agree with the examiner's decision which shifted the burden of proof. In summary, we think the limitation of "imparting a persistent crimp" finds support in Richmond's disclosure of "increasing the degree of permanence [of crimp]." The limitation of "plasticizing" is supported by "softening" in view of Breen's synonymous use of "soften or plasticize." Also we find no error in the reasoning below that Richmond discloses "substantially zero tension" and the necessary crimp in view of the overfeed and turbulent air employed by Richmond.

Concerning the above motion, neither the examiner nor the board appears to have read the count as narrowly as Richmond here contends it should be read. For example, it is Richmond's position that it is while the bundle of filaments are "whipping about" in the gaseous stream that they are "rendered plastic, separated from one another and crimped individually." In deciding the motion, neither the examiner nor the board appears to have treated this limitation specifically. It appears, however, that this feature is generally disclosed in the British application in the statement that:

> According to the present invention, in subjecting a filamentary bundle to the action of a turbulent stream of fluid for the purpose stated, a hot gaseous fluid is used with the object of increasing the degree of permanence of the loops and sinuosities imparted to the individual filaments of the bundle by the action of the turbulent stream.
> * * *

We pass now to the second issue on appeal, i. e., did Breen establish an actual reduction to practice prior to March 1, 1957, the date of constructive reduction to practice accorded Richmond on the basis of the filing date of the British Provisional Specification?

It is Breen's position that:

> Breen et al. has shown by adequately corroborated and credible testimony and by supporting documentary evidence that on at least six occasions between March and July of 1951, the process steps of the Count were successfully performed. It has been

shown that synthetic linear polymeric filaments ("Dacron" polyethylene terephthalate) were fed into a plasticizing stream of a compressible fluid having a temperature of at least about 300° F.; that the individual filaments while in a plastic state and under substantially zero tension were separated from each other and crimped individually while whipping about in the turbulent plasticizing stream; and that the crimp imparted thereby was set and had a random, three-dimensional, curvilinear, extensible configuration.

Richmond's position is:

To sum up, the Breen et al. experiments do not show a reduction to practice of the process defined in the count because:

a) In none of the experiments was the temperature of the gas in contact with the filaments determined to be at least 300° F. or sufficiently high to plasticize the filaments.

As admitted by the witnesses for Breen et al. the minimum plasticizing temperature for the fiber with which they were concerned was almost 400° F. While they supplied air at a higher temperature, the structure of the jet was such that air at *room* temperature was also aspirated into the device, and the air which contacted the filaments was a mixture of the hot air and the cold air. The relative quantities of the two streams were unknown. In the single case where it was measured, the average temperature of the gases emerging from the jet was below 300° F.

b) In none of the experiments was it possible to observe the filaments being crimped. It was therefore impossible to say that the individual filaments

while in a plastic state and under substantially zero tension (were) separated from each other and crimped individually while whipping about in the turbulent plasticizing stream.

The fact that the filaments were crimped does not show that there was turbulence because it has been established that crimp forms even without turbulence. (Breen et al. Exhibit 17, page 5, paragraph 1, first three sentences.)

c) There is no firm *contemporaneous* evidence that the filaments obtained had a "random, three-dimensional, curvilinear, extensible" crimp. None of the samples attached to the Exhibits was clearly identified as having been made by the processes described. Lauterbach, in his report (Breen et al. Exhibit 17) referred to the crimp as "saw-toothed" and irregular.

Certainly the written report of 1951 is to be accorded heavier weight than the memory of the witnesses, who can scarcely be described as disinterested, in 1963. Moreover, the tendency of the witnesses, including even Lauterbach himself, to contradict the carefully written report casts doubt on the weight and reliability of the more hastily written notebooks, and the recollections of the witness with respect to the material recorded therein.

d) None of the yarns asserted to have been made was tested; or more precisely none of the test results on yarns made in the experiments were put into evidence. Breen et al. excuse this by saying that once the yarn was made, the process defined in the count was completely reduced to practice and testing was unnecessary. * * *

These opposed positions have required a review of the testimony and exhibits offered by Breen to determine whether they do in fact establish an actual reduction to practice of a process as specifically defined and limited by the terms of the count in issue.

■ In reviewing the testimony and exhibits we have been concerned not only with the burden of the appellants as junior party to prove their case by a preponderance of the evidence, but also with appellants' delay of over six years, after the allegedly successful reduction to practice, in filing the application here in issue. There are substantial reasons of

sound public policy why such a delay is a factor to be considered in a case such as the present and we think the board properly took note of this conduct and the lack of any explanation therefor.

In Birmingham v. Randall, 171 F.2d 957, 36 CCPA 780, this court pointed out:

* * * The failure of appellee to file an application covering the invention in issue for more than seven years after the last-mentioned experiments also raises a strong presumption that the results of those experiments were not considered satisfactory.

Breen's proofs relate to what are asserted to be at least six actual reductions to practice during the period beginning in March 1951 and extending through July of that year. We agree with the ultimate conclusion of the board that:

* * * the evidence concerning the work done by Breen in 1951 does not establish an actual reduction to practice of the invention in issue. Breen et al. accordingly have not established an actual reduction to practice prior to the date accorded Richmond et al. for reduction to practice and are the second to reduce to practice. Since Breen et al. have not established the diligence required of the second to reduce to practice, priority will be awarded to Richmond et al., the first to complete the invention by constructively reducing it to practice.

In essence, Breen's case stands or falls on the proofs of some six alleged reductions to practice in the period of March–July 1951. The testimony concerning these events was not taken until 1963, a factor which requires consideration as the testimony is based on recollection of events occurring some 12 years earlier. Breen's case does not rest solely upon such testimony for there are certain contemporaneous written records which were offered in evidence. As stated in Buffington et al. v. Blair et al., 121 F.2d 635, 637, 28 CCPA 1382, 1385: "The record must be considered as a whole, and all competent testimony making up the continuous story given its proper place and weight." However, even when so considered, we do not find satisfactory proofs by Breen of a reduction to practice of a process meeting the limitations of the count in issue. Since the proofs are deficient in different particulars in the various tests relied upon by Breen, we shall consider them separately.

In so doing, a determinative factor in our resolution of the issue has been the precise and limited nature of the count in issue. Thus, we have considered it to be an essential part of the claimed process which constitutes the subject matter of this interference that filaments are plasticized, separated from one another and individually crimped while whipping about in a turbulent gaseous stream, capable of plasticizing the filaments and having a temperature of at least 300° F. Furthermore, we have considered it to be essential that the crimp obtained be random, curvilinear, three-dimensional and extensible.

While we do not find reason in the record considered as a whole for doubting a joint conception and joint efforts directed towards a reduction to practice by appellants, we do not find that appellants have proven a reduction to practice of the process as limited by the count in issue.

The evidence fairly establishes that Breen and the co-inventor Lauterbach were active during the period of March–July 1951 in testing new ways to make crimped fiber. Among these tests were the six specific experiments here relied upon as establishing an actual reduction to practice of a process meeting the count in issue.

The first two experiments can be considered together. Pages 9 and 10 of Lauterbach's notebook (Breen Exh. 3) and the testing report (Breen Exh. 4), allegedly show that filaments falling within the count were heated using air as the heat transfer medium and that this was done in the apparatus referred to as "the jet on Albert's Tower." The notebook

contains the following description of the two experiments:

*Experiment 1:*

\* \* \* To evaluate hot air supply for crimper design used hot air & jet on Albert's tower, taking yarn directly from bobbin & piddling it into bucket. No crimp until air temperature was high. Using yarn described above at air temp of abt. 235° C. a *beautiful crimp* was obtained.

*Experiment 2:*

\* \* \* The yarn was piddled into a 3″ diameter tube, about 1 ft. long with holes on the side. It was easy to wind it upon a bobbin from there with the usual wind-up equipment. *Excellent crimp* obtained in all cases. [Emphasis added.]

We find no acceptable proof as to the construction, size or shape of this "jet." It was described generally by Lauterbach but it was made clear on his cross examination that he was not familiar with such structural details. The jet was admittedly designed for an entirely different undisclosed purpose. The temperature of the air fed to the jet was measured at about 235° C. (455° F.) but the air in contact with the filaments was a mixture of hot and cold air. Its temperature was not measured. No measurement was made of the *quantity* of hot air fed or the *quantity* of cold air aspirated, so that the temperature of the combined stream could not be calculated. Lauterbach admitted that he did not know the temperature of the air actually in contact with the filaments. He did not know whether it was at least 300° F. as required by the count.

The jet itself was opaque so there was no way to know whether the filaments, as they passed through the jet, were treated in accordance with the terms of the count. The record herein does not establish that "the individual filaments, while in a plastic state" were "separated from each other and crimped individually while whipping about in the turbulent plasticizing stream."

There is no clear evidence that the filaments were separated before or after crimping—or indeed that they were separated at all. There is no evidence that they were crimped while "whipping about" in a gas stream having a temperature sufficient to plasticize the yarn. There is no evidence that the stream was turbulent. The pressure in the March 14th run is not given. In the March 15th run the pressure of the hot air stream was said to be 160 psi. However, whether this pressure would produce a turbulent combined stream depends on many factors including the geometry of the jet, and the quantity of hot air added. The claim specifically requires a stream in contact with the filaments which is simultaneously turbulent and capable of plasticizing the filaments. There is no clear evidence that such a stream existed in the Lauterbach experiments.

Breen has asked us to note Lauterbach's reference in his notebook to the "beautiful" crimp which was produced in the fibers. In Breen's brief, this cryptic entry is explained as meaning a "random, three-dimensional, curvilinear and extensible" crimp. It is true that Kolb, Lauterbach's supervisor, so testified but as against this we find in Richmond Cross Exh. 3 a contemporaneous record of appellants which describes the crimp as a "saw-tooth" crimp. Thus, we do not think Breen's proof carries conviction as to the meaning in terms of the count which should be ascribed to Lauterbach's use of the term "beautiful." While fibers made by Lauterbach were sent to a testing laboratory, no one from that laboratory testified and on the present record, no one knows what was done to the fibers in the laboratory.

The terms of the count require that the crimp be "persistent" and that it be "random, three-dimensional, curvilinear, and extensible." As noted above, the contemporaneous records describe the crimp as "saw-tooth," not "curvilinear." Moreover, one of the tests which was to be applied to this fiber at the testing laboratory was to determine "crimp retention." If the results of this test showed a low or negligible crimp retention, there would be no reduction to practice. Although the

request for testing was introduced in evidence no results of that test are to be found in the record.

In summary, therefore, we do not find that the conditions under which the filaments were treated in experiments 1 and 2 or the properties of the products were established to come within the terms of the count. Thus we find the proofs as to these experiments fail to establish a reduction to practice of a process meeting the terms of the count in issue.

The third experiment upon which Breen relies is connected with Breen's Exh. 6 which consists of 3 pages from Breen's notebook. Breen testified that this experiment grew out of his idea of directing a pin-point stream of hot gases against a group of filaments passing through a vertical tube. The subject of the experiment is stated as "Economical Air Jet Crimper Design," and the exhibit begins "Power consumption at the single yarn crimping position may be a critical factor in determining process economy." A sketch appears on the first page of this exhibit which Breen's brief treats as illustrating what actually occurred in the devices made for and used in this experiment. We note that nothing in the sketch indicates the presence of turbulent conditions in the tube. Since it seems clear that heated slack filaments will crimp without turbulence, we reject, in the absence of supporting proof, Breen's position that since the sketch shows crimping, it is evidence that Breen contemplated a turbulent zone. The exhibit states, "Several types of two component yarns * * * were run * * * and all were readily crimped over a wide range of crimp types by controlling the power input * * *."

The second page of Breen's Exh. 6 describes the construction of several devices or units. The first ("Jet #1") consisted of a Teflon tube into which a tiny hypodermic needle was angularly inserted.

Breen testified that he carried out experiments with the device labelled "Jet #1" and these are described on page 3 of Breen's Exh. 6. In these experiments, according to Breen, air at 90 psi was delivered to the hypodermic needle and the needle was heated electrically. Drawn Dacron yarn was delivered to the top of the Teflon tube and allowed to pass vertically through it. A crimped yarn is said to have been obtained.

This experiment, however, fails to show a reduction to practice of a process as defined by the count. The hot gas issuing from the hypodermic needle is said to have been at 400° C. But Spear, Breen's assistant, testified this was measured by a thermocouple inserted at the junction of the hypodermic needle and the Teflon tube. As such it was directly exposed to the path of the hot gas and to any radiation from the glowing hypodermic needle. The temperature of 400° C. read on this thermocouple was thus not indicative of the temperature of the air in contact with the filaments which included a mixture of the stream of hot air from the hypodermic needle and cold air drawn in from the top of the vertical tube. Thus Breen has not shown that it was at least 300° F. and Breen's testimony on the temperature required to plasticize the yarn is not clear.

The jet device used by Breen was Teflon. It was opaque. No one knew what occurred within the jet. Assuming that plasticization or separation occurred, it was not established that crimping followed separation or preceded it; or that plasticization followed separation or preceded it.

The count also requires "whipping about" of the filaments in a "turbulent plasticizing stream." No one testified to seeing filaments "whipping about." No one knows whether or not the stream was turbulent. The air pressure is said by Breen to have been 90 psi, but this was not corroborated and in any case, it is not clear that the amount of air introduced through the tiny hypodermic needle would be sufficient to impart turbulence to the much larger stream passing through the vertical tube. There is nothing in the contemporaneous records which would in-

dicate that Breen got turbulence or that turbulence was considered necessary.

While page 3 of Exh. 6 has yarn attached to it, Breen did not clearly identify the sample with the experiment described thereon.

Spear, Breen's assistant testified:

XQ77. Mr. Spear, what did you do with the product after you had made it, referring again to Breen's Exhibits 6, 10 and 13? A. Well, this was put on a package, and then of course—I mean, this again is kind of out of my line— Al would submit these samples to the P. T. Lab, and from there on I had nothing—

XQ78. As far as you know it was put on a spool, on these little packages such as appear in Breen's Exhibit 13, and from there on you know nothing about it? A. That is right.

There is nothing of record indicating the results obtained from the Physical Testing Laboratory. Breen argues that testing was not necessary because the utility of the yarn was obvious. However, the object of the process set forth was not to make just any crimped yarn but rather to produce yarn with a "persistent" crimp, and crimp persistency was one of the areas which Lauterbach asked to be investigated when he filed the request for testing of the results of Exh. 4.

We think, therefore, that Breen's Experiment No. 3 does not establish a reduction to practice of the process as required by the count.

The fourth experiment is associated with Breen Exhs. 5, 7, 8, 9, 11, 12, 14, 15, 16 and 17. The crimping operation is particularly associated with Breen Exhs. 5, 7, 8, 9 and 11. While these exhibits and the oral testimony pertinent thereto indicate considerable activity on behalf of Breen and Lauterbach, the proofs fall short of establishing a reduction to practice of a process meeting the limitations of the count in issue. The temperature limitation is not met. The temperature of the gas into which the filaments were fed is not established by direct measurement thereof. It cannot be

calculated from the data of record. The presence of turbulence in the jet is not proven. No parameters of jet design, flow rates etc., have been established by which the presence of turbulence in the jet may be reasonably inferred. As pointed out in Richmond's brief:

Breen et al. Exhibit 5 is a page from Lauterbach's notebook showing sketches made by Lauterbach of the apparatus used for this Experiment. Section (a) on that page is a wiring diagram of a heater used to heat the air. Section (b) shows the jet construction. As shown there, the jet comprised a brass block having a hollow cavity. A funnel extended from the top of this block to some point near the bottom of the cavity. Hot air was fed into the cavity from the side. Yarn and cold air were sucked into the funnel. It will be observed that the hot gas did not contact the yarn directly; rather it passed around the funnel and joined the stream of cold air near the bottom of the block. There is an arrow directed downwardly from the block reading "mixed air and threadline".

Sketch (c) on this page shows the jet assembled with an expander tube. This was an element containing a straight, cylindrical top part which was connected to the bottom of the jet block, and an outwardly flared, conical bottom part. A thermocouple ("thermocouple 2") was placed in the cylindrical part to measure mixed air temperature. There was also a means for measuring the temperature of the hot air before it was introduced into the jet. This is "thermocouple 1" in section (a) on this same page.

The count requires that the filaments be brought into contact with gas at at least 300° F. and that the filaments be separated from each other and crimped individually while whipping about in a "turbulent plasticizing stream." Breen Exh. 5 does not show where the filaments were crimped. If this occurred in the funnel, the gas in the funnel was atmospheric air heated but not shown to be at 300° F. If this occurred in the narrow

throat below the funnel, the temperature of the mixed gas stream there was below the temperature of the hot gas, because cold air from the funnel had been mixed with the hot gas.

The assumption that the yarn was crimped just as it emerged from the funnel of Lauterbach's device, is the one most favorable to Breen. However, in the sketch shown in par. (c) of Breen Exh. 5 it appears that in 1951 Lauterbach thought that the yarn was crimped in the expander tube below thermocouple 2 where the temperature is less than 300° F. and far below the asserted plasticizing temperature of Dacron. Lauterbach's report (Breen Exh. 17), Fig. 2, refers to the conical expander tube as the "crimper."

Thus, according to Lauterbach's own records, the requirement of the count that the filaments be crimped while "whipping about" in a "plasticizing stream" was not met.

While the air pressure used in this apparatus was 8 psi this does not necessarily establish the existence of turbulence in the apparatus. It is necessary to know more about the dimensions and geometry of the system than Breen has established. We note in this connection that the idea of turbulence as an operative factor in the process is absent from any of the contemporaneous records which Breen relies upon.

If turbulence did in fact occur, it would seem most likely to have occurred in the flared expander tube. Here, however, the temperature in the flared expander tube was below 300° F. and below the plasticizing temperature of the Dacron filaments. This proof falls short of meeting the requirements of the count that crimping occur while the plastic filaments "whip about" in "the turbulent, plasticizing stream."

Breen argues that because the Richmond specification describes the same general type of jet and specifies turbulence, that turbulence must have been obtained in the Breen jets. There is no doubt that it is possible to create turbulent conditions in many different kinds of jets. It would, we are certain, have been possible to establish conditions from which turbulence would result in the jet shown in Breen Exh. 5. We are, however, not free to supply by speculation the proofs of this fact, the burden of which was on Breen.

Since the count does not require that turbulence occur within the jet, it is clear that it does not require a jet. The count does require, however, that the yarn be crimped in a "turbulent" stream which is also "plasticizing." In the case of hot air as the gas and Dacron as the filaments this requires that the yarn be crimped in a turbulent stream whose temperature is at least 392° F. (200° C., according to Lauterbach's testimony). If, referring to Lauterbach's sketch, turbulence occurred in the jet and then crimping took place in the expander tube, the count is not met.

The board's opinion refers to Breen patent No. 2,783,609 (Richmond Cross Exh. 5) and notes that in Fig. 1 of that patent the yarn is crimped by turbulence occurring after the yarn has left the jet, corresponding to the expander cone of the device shown under (c) in Breen Exh. 5. Breen argues that the patent drawing applies only to the particular jet device, dimensions and process disclosed in the patent. The fact is that whether one has turbulence and where this turbulence occurs depends on the apparatus and the operating conditions. For any apparatus there are flow rates and pressures which will give turbulence and other conditions which will not. Breen has not shown that under the operating conditions used by Dr. Lauterbach, with the particular type of jet he used, turbulence will necessarily occur. Neither has Breen shown that the turbulence occurred where the temperature of the gas was 300° F. or higher and sufficient to plasticize the filaments.

Breen argues that since the details of Richmond's jet and the operating conditions relating thereto have been but generally stated in the Richmond British application, it should be assumed that if Richmond had turbulence, then Breen had turbulence. Since the details of the

Breen jet design and the operating conditions within the jet during the experiments on which Breen relies to establish a reduction to practice were not established, it is not possible from the present record to relate Breen's jet operation to that of Richmond. Here again, appealing as is Breen's argument, Breen's burden is to establish facts from which the suggested comparison may be validly made and this we find Breen has failed to do.

After Lauterbach made a quantity of yarn it was sent to the Newport Laboratory to be made into a fabric. Production of yarn defined by the count is all that need be established to show operability of the process as defined in the count. However, the count is very specific in defining the crimp in the yarn as having "a random, three-dimensional, curvilinear, extensible configuration." It is this limitation which Breen is required to show was present in the end product of the experiments relied upon to establish the fourth alleged reduction to practice. Breen's proofs fail to establish that the yarn sent to the Newport Laboratory had these properties. No results of tests made on the yarn were reported, though it is clear from Lauterbach's notebook (Breen Exh. 8) that some testing was carried out. There is no clear showing that the product made in the fourth experiment met the objects of the count.

We find, therefore, that Breen's proofs regarding the fourth experiment are insufficient to establish an actual reduction to practice of a process as limited by the express terms of the count.

The fifth and sixth experiments which Breen relies upon to establish an actual reduction to practice were conducted in apparatus using "micro-jets." The proofs as to the fifth experiment fail to establish that it was a reduction to practice of a process as limited by the significant limitations in the count. Thus, the temperature of the air contacting the fibers, which was a mixture of hot and cold air, was not measured and is unknown. There is no testimony as to air pressure, or flow rates, so that it is unknown whether or not there was turbulence. As to the product of this experiment, no samples are available and the testimony concerning it is not persuasive that the fibers possessed the specific crimp required by the count.

In the sixth experiment, Dacron filaments were treated to 150 psi steam in a "microjet." The precise type of jet used is not established and there is no evidence of measurement of the steam temperature at the jet. There is nothing but speculation that the process met the terms of the count which require that individual filaments, while in a plastic state and under substantially zero tension be separated from one another and crimped individually while whipping about in the turbulent plasticizing stream. Since flow rates are not given and temperatures not measured, there is no way to tell whether the stream was either turbulent or plasticizing, much less what happened to the filaments in the stream.

Breen testified the temperature of 150 pounds saturated steam is 366° F. Steam at this temperature was led through a line for a distance of about 6 feet and then passed through a small hypodermic needle into the jet. In the experiments recounted on pages 53 (Exh. 6) and 66 (Exh. 10) of Breen's notebook, air, supposedly at 400° C., was injected in the same way and was not shown to have given a mixed air temperature above the melting point of Dacron. It was not established that the temperature of the fluid into which the filaments were fed was at least 300° F. as required by the count.

Breen Exh. 13 has two yarn samples attached to it. The samples were identified by Spear as having been made in the experiment there described. Samples made according to Exh. 13 were sent to the physical testing laboratory. However, we have no report on these tests.

It seems clear, therefore, that Breen failed to establish that the process of the sixth experiment was carried out with the limitations imposed by the count. There also is a failure of proof that the filaments crimped in the sixth experiment

were crimped in the manner required by the express language of the count.

Breen's case falls simply and solely by reason of the failure of proofs to establish a reduction to practice of the process as expressly limited and defined by the precise terms of the count. On this basis, and this basis only, the decision of the board is affirmed.

Affirmed.