**Alvin Leonard BREEN and Robert William Freeman, Appellants,**

v.

**David Ernest HENSHAW, Appellee.**

Patent Appeal No. 8825.

United States Court of Customs and Patent Appeals.

Feb. 15, 1973.

Don M. Kerr, A. Newton Huff, Wilmington, Del., attorneys of record, for appellants. Gerald A. Hapka, Washington, D. C., of counsel.

G. Franklin Rothwell, Robert V. Sloan, Sughrue, Rothwell, Mion, Zinn & Macpeak, Washington, D. C., attorneys of record, for appellee.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN, and LANE, Judges.

MARKEY, Chief Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention of the subject matter of the ten counts to sen-

ior party Henshaw. Appellants provoked the interference by presenting claims in their application serial No. 343,856, filed February 10, 1964, which were copied from U. S. Patent No. 3,225,533, issued December 28, 1965, to Henshaw on application serial No. 231,457, filed October 18, 1962.[1] Henshaw relied upon his Australian priority dates of October 19, 1961 and January 16, 1962, the benefit of which was accorded only for counts 1 and 2. Breen et al. asserted four actual reductions to practice of counts 1 and 2 and one actual reduction of counts 3 to 10, all at times well before Henshaw's earliest date. The board found otherwise, holding that Breen et al. had not proven "with the requisite preponderance of the evidence actual reduction to practice of a process for forming (our emphasis) 'stable twisted threads' as set forth in the counts in issue." We affirm the board's decision.

## THE SUBJECT MATTER

The basic invention involved in this interference is set forth in the Henshaw patent:

This invention resides in forming a thread having alternating zones of opposite twist and stabilizing the twist by bringing the thread so twisted together with another thread and allowing it to twist around the other thread. Conveniently two or more threads each with zones of alternating twist, may be brought together with their twist zones in suitable phase relationship and allowed to twist around each other to achieve stabilization.

The initial step of forming alternating zones of opposite twist is known in the art as false twisting and the false twist so imparted differs from the stabilized "self-twist" of the invention in that some form of setting is necessary to retain the twist when the thread is left free of support.

The counts are directed to the process for forming these stable twisted threads, count 2 being representative:

2. The process for forming stable twisted threads from at least two strands, comprising the steps of separately twisting each of at least two strands so that each strand has repeated along its length alternating zones of opposite twist, converging the twisted strands in such a way that like twist zones thereof are at least partly in phase, and leaving the converged strands free of support along a distance sufficient to allow the strands to partly untwist and thereby to twist about one another.

Count 1 requires that only one of the strands be false twisted in the initial step. Counts 3 to 10 add limitations on the length of distance allowed for untwisting and cabling around the other strand, the phase relationships at convergence, and the method of effecting the false twisting.

## THE RECORD

The parties did not take testimony but instead filed stipulated records pursuant to Rule 272(c). The Breen et al. record consists of affidavits by the joint inventors and ten corroborating witnesses and documentary exhibits. Henshaw presented only rebuttal evidence in the form of his own affidavit, abridged transcripts of interviews with Breen, Freeman, and coworker Meyer and documentary exhibits from the files of Du-Pont, assignee of the Breen et al. application.

## THE BREEN ET AL. ALLEGED REDUCTIONS TO PRACTICE

I. Tow-To-Yarn Work

The first three asserted actual reductions to practice stem from activities of the inventors during the investigation of a tow-to-yarn process. The basic idea was to false twist a multifilament

1. The Henshaw patent is assigned to Commonwealth Scientific and Industrial Research Organization while the Breen et al. application is assigned to DuPont.

strand, converge it with other similarly false-twisted strands to form a rope, combine several ropes into a tow, subject the tow to various treatments, then separate the tow back into ropes and thence into the original strands. Originally, the *false* twist was conceived as means for "identifying" the individual strands, i. e. for preventing entanglement and thus aiding separation.

The first experiment relied upon by appellants was run at the Tech. Lab of the "May plant" in Camden, South Carolina on February 6, 7 and 8, 1958. The board found, and we agree therewith, that it was established that during these activities the steps of the process as defined in counts 1 and 2 were actually carried out. Although Breen and Freeman had no preconception that the twist cabling of the final step of the process would occur, they did observe and record (Exhibit K) the tendency of the false twisted threadlines to twist together after the same had contacted each other and had been left free of support. These observations are corroborated by the affidavits of coworkers Blackwell and Lunney. Breen also recorded in his notebook the idea that this cabling "is believed to be desirable as a way of holding the twist as would be the case at the tow convergence." However, the board went on to point out:

> [W]e do *not* hold that the production of a *"stable* twisted thread" (our emphasis) was proven.

■ Herein lies the crux of appellants' case for priority. The counts require not only that the enumerated steps be carried out but also that they produce "stable twisted threads." See Breen v. Richmond, 54 CCPA 719, 366 F.2d 482, 151 USPQ 194 (1966). Thus, as properly held by the board under the authority of Conner v. Joris, 44 CCPA 772, 241 F.2d 944, 113 USPQ 56 (1957), actual reduction to practice requires proof of utility of the process pursuant to this intended purpose.

It is at this point that the scope of the term "stable" as employed in the counts must be determined. Appellants argue that neither party intended to restrict the counts to the production of a "use-stable" yarn, i. e. one which is per se useful without any preliminary twist setting. Instead, appellants urge, the word "stable" merely indicates a "twist-stable" condition in that the product will retain the twist when a length is freely suspended. Treatment to set the twist prior to practical use may still be contemplated. Or the twisted product may only represent an intermediate stage in textile processing, later to be disassembled. Such a meaning is said to be consistent with the disclosure of the specifications of both parties. Henshaw, on the other hand, contends that "stable" as used in the counts, which originated in the Henshaw patent, refers to stability of the twist "in practical usage, i. e. use-stable."

The board plainly found applicable a broader meaning than the "use-stable" connotation being advanced by Henshaw. Thus they took into consideration evidence of Breen et al. with respect to proving utility of the process for the production either of

> (1) "stable twisted threads" useful in the further processing of ultimately useful yarns or (2) "stable twisted threads" ultimately useful in themselves.

■ We think the board properly interpreted the counts. As it pointed out, although the disclosure of the Breen et al. application is mainly "directed to a finished yarn structure" with further setting an option that "may be desirable" prior to use, there is reference to the use of the process as an intermediate textile operation. It is true the counts have their basis in the Henshaw patent and must be interpreted in accordance therewith. But we can find no definition in this patent for the term "stable" or disclosure which would limit its scope to "use-stable." Instead it is apparent that, although the primary objective of Henshaw is the production of stable twisted yarns from staple fibers, other processing applications are similarly contemplated. In particular

we note that part of the specification directed to the use of the invention in the production of "rovings", an earlier stage of yarn production, wherein:

Because the twist in the roving is not uniform, it may be necessary before the next processing stage to remove some or all of the twist in order to ensure the proper functioning of the drafting process.

Hence the term "stable" clearly includes a "use-stable" yarn but we do not think it is restricted thereto. The degree of stability required for the alternative processing operations may well be less stringent but must at least permit the operations to be successfully completed.

■ Turning back to the Tech. Lab experiment, we look for contemporaneous evidence that the cabled yarn so formed was determined to be stable in either of these senses. The claim of appellants that the product was inherently stable, as evidenced by disclosures in the later filed specifications of both parties that these process steps necessarily lead to a stable twisted thread, can be given no weight. It is well-settled that conception and reduction to practice cannot be established nunc pro tunc. There must be contemporaneous recognition and appreciation of the invention represented by the counts. Langer v. Kaufman, 59 CCPA ——, 465 F.2d 915, 175 USPQ 172 (1972); Heard v. Burton, 51 CCPA 1502, 333 F.2d 239, 142 USPQ 97 (1964). Nor are the statements of the joint inventors in the affidavits made in 1969 sufficient to fulfill this requirement for *contemporaneous* recognition.

The only evidence relevant to the question of the production of stable twisted threads useful per se during this experiment is Breen's notebook record (Exhibit M) of the preparation of a carpet sample. Purportedly this sample was made from the cabled yarn although the entry does not specifically so identify the starting material. But the sample itself has not been introduced into evidence. Its preparation has not been corroborated, only co-inventor Freeman having witnessed Breen's notebook. Nor can we find any indication in the contemporaneous record that stability of the plied yarn so as to be useful per se in the manufacture of carpets was recognized at that time.

The remainder of the evidence relates to the tow-to-yarn process. Appellants urge it has been adequately proven that the plied yarn produced in this intermediate step retained this form throughout the process. Moreover, it is asserted that it was the production of this cabled form which provided the means for maintaining yarn identity in the tow-to-yarn process, thus facilitating separation to individual yarns in the final step.

We do not find it necessary to reach the question of whether or not the plied yarn in fact retained its form. The decisive point at this stage lies in whether the tow-to-yarn process was successfully completed with the forming of the plied yarn serving its alleged function. We must agree with the board's conclusion that:

Nothing indicates that Breen and Freeman were really satisfied with the process even for the purpose of separation in the tow-to-yarn process.

Both the contemporaneous separation report of Breen (Exhibit O) and the later project report of Breen and Freeman (Report No. EDR–59–10, Exhibit GG) bear evidence to the fact that tow separation was extremely difficult and further work was necessary. Although appellants urge that the record establishes that the inventors were satisfied with the process of the counts as a means of maintaining yarn identification, even they do not contend that the tow-to-yarn process as a whole was successful at this point in time. This we find to be a fatal defect.

This first Tech. Lab investigation was followed by further experiments on a larger scale using actual production equipment of the "May plant." These runs are designated in the record as the Second Plant Trial of April 30–May 2, 1958 and the Third Plant Trial of Sep-

tember 22–26, 1958. Rather than go into a detailed review of these experiments, we will simply indicate the evidence we consider crucial but cannot find.

Looking at the record from the "use-stable" viewpoint, we find no results of any tests of the plied yarn product to determine its stability or utility per se. Appellants maintain that special tests were not necessary to prove stability, it being apparent simply by visual inspection. But mere observation clearly cannot be determinative of stability in the sense of "use-stable." Nor can we accept the contention that the twisted thread produced in these experiments had obvious utility in the manner in which other plied yarns are used. The Breen at al. application itself makes it clear that this degree of stability is highly unexpected.

Recognition at that time of the production of stable twisted threads which were per se useful not having been found, we turn to the alternative concept. Was the tow-to-yarn process employing these plied strands as the means for yarn identification ever successfully carried out? Once again we cannot find persuasive evidence that this process was in fact satisfactory. The project report issued by Breen and Freeman after the completion of this work (Exhibit GG) summarizes earlier recorded observations on the separation problems still being encountered. On page 12 of this report it is stated with respect to the tow fabricated in the Second Plant Trial that separation "was not completely continuous due to (1) the tendency for filaments at the zero twist sections in adjacent yarns to entangle, and (2) the difficulty in determining the yarn end order during convergence within a cabled group." Although in the Third Plant Trial the entangling of filaments at zero twist sections was reduced by keeping the zero twist portions of adjacent strands out of phase with one another, separation still was not satisfactory. Here the problem was said to be that "the level of false twist imparted

during this plant trial was below the ½ tpi average (as drawn) desired for good yarn identity and ease of yarn separation." The inventors went on to hypothesize:

Further separation studies revealed that when false twist is used for yarn identification, the energy developed from yarn twist liveliness is expended not only in forming paired cables but, to a small extent, to rope cables which interfere with separation. \* \* \* As a means of overcoming the rope cabling present in the tow materials, the procedure for yarn separation shown in Figure 12 was developed. \* \* \* By this means, continuous separation of yarns from the tow material was limited only by the poor yarn identity. All evidence indicated that further ease of separation would result from higher twist levels for improved yarn identity.

Thus it has not been established by the requisite preponderance of the evidence that the process of the counts was demonstrated to have utility in that the twisted threads so formed would permit completion of the tow-to-yarn process.

II. The Demonstration of Freeman and Meyer

In August of 1959 Freeman was transferred to a group engaged in research and development work in making carpets. A year later, on September 13, 1960, he recorded in his notebook (Exhibit KK) the concept of preparing simulated twist yarns by "false twisting single groups of yarns and then bringing false twisted yarns of the same twist direction together allowing the twist liveliness of the yarns to cable twist in the opposite direction developing a plied yarn." It was further noted that Meyer was planning to demonstrate this plying technique.

The experiment itself was run by Meyer with Freeman assisting on December 22, 1960 and recorded by Meyer (Exhibit LL). It was reported therein that "the yarn twisted very well and cabled tightly with a zero twist section of

about 2–3 inches. The nature of the bulked yarn locked the twist in very well." But this was the extent of the activities. As pointed out by the board

The contemporaneous record falls silent at this point with respect to any tests or use of that yarn whatsoever. The yarn was produced, period. The structure of that yarn would support counts 1 and 2 only.

Assertions by Freeman and Meyer in their later affidavits that the yarns were stable and had obvious utilities do not fulfill the requirement for contemporaneous recognition by the inventors of the production of stable twisted threads useful per se. Here the indications are clearly to the contrary. In Patent Proposal NPD–34 (Exhibit 10) submitted on January 31, 1961 which formed the basis for the present application, it was flatly stated that "[a]fter twist setting, it can·be used as any carpet yarn * * *." As pointed out by the board, it was only at a later unspecified date that the application draft was revised to teach that the yarns need not be set prior to use.

In conclusion, appellants have failed to establish by a preponderance of the evidence actual reduction to practice of the process of the counts. The decision of the board is affirmed.

Affirmed.