William L. KNORR, Appellant,

v.

Robert Joseph PEARSON and Rodney G. Buergin, Appellees.

Appeal Nos. 81–604, 81–605.

United States Court of Customs and Patent Appeals.

Feb. 25, 1982.

for supporting gypsum wallboard in the construction of fireproof elevator shaft walls.

Arthur L. Whinston, Portland, Or., for appellant.

Allen H. Gerstein and Mary E. Bak, Chicago, Ill., and Robert T. Hause, Buffalo, N.Y., for appellees.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

This is a consolidated appeal from decisions of the Patent and Trademark Office Board of Interferences ("board") awarding priority of invention of all counts in two interferences to the junior party Pearson and Buergin ("Pearson et al."). We affirm.

## BACKGROUND

The applications and patent [1] in interference relate to a sheet metal "I" beam stud

The entire "I" beam stud is formed from a single piece of sheet metal. The flat, vertical sides comprise an outer flange (layer) 22 with a 180° bend at one vertical edge and an inner flange (layer) 26 extending from the bend parallel to the outer layer 22 for about one-half the width of the outer layer. The two inner layers 26 and 50 are connected by a central web 12. The controversy here involves the provision of holes 32 in the outer layer 22 and a space 30 between the outer layer 22 and inner layer 26 of the elevator shaft side. When the stud is subjected to fire, the air inside the space between the layers is heated and rises. Cooling air is drawn into a hole at the bottom. Count 1 from interference 99,853 is representative: [2]

In a shaftwall, a plurality of vertical studs of sheet metal, each stud having at one side thereof an inner flange [layer] and an outer flange [layer] folded back

---

1. Interference 99,853 involves Knorr patent 4,047,355, Knorr reissue application 897,660, and Pearson et al. application 845,010, and includes 11 counts. Interference 100,127 involves the Knorr reissue application and the Pearson et al. application, and includes one count, corresponding identically to count 11 in interference 99,853.

2. Count 11 in interference 99,853 and the single count in interference 100,127 do not require a hole in the outer layer.

on and spaced from the first flange to form a thin, vertical passage open at the top and one side,

the inner and outer flanges being parallel to each other and overlapping portions thereof forming a double thickness flange,

the overlapping portions of the second flange having an opening therethrough into the space between the flanges,

the openings being spaced low on the studs to admit air into the passages,

and gypsum boards secured to the other side of the studs.

In 1974, Studco, Inc. ("Studco"), assignee of Knorr, developed an "I" beam stud which had no holes in the outer layer and no appreciable space between the outer and inner layers. National Gypsum Co. ("National"), assignee of Pearson et al., a manufacturer of gypsum board, was interested in the stud, and on October 8, 1975, a panel constructed of Studco studs and National gypsum board was fire tested at the University of California Testing Facility. Both Knorr of Studco and Pearson of National were present. The panel failed to achieve an ASTM E–119 two-hour fire rating because, when the corridor side of a stud was exposed to fire, a thermocouple on the elevator shaft side of the stud registered a temperature rise of 325° after about 1 hour and 49 minutes. The record indicates that after the test, Knorr suggested putting holes in the outer layer of the elevator shaft side "to vent heated gases." Thereafter, on the same date, Pearson telephoned Buergin (coinventor) and told him of Knorr's suggestion. Buergin suggested opening a space between the layers to allow hot air in the space to rise and be vented and to allow cooler air to be drawn in.

On October 16, 1975, a panel constructed by Pearson using Studco studs (with holes in the outer layer) was fire tested ("test 500") and passed the ASTM test. Pearson testified that, during construction of the panel, he enlarged the gap between the inner and outer layers of the shaft side of the stud (the side not exposed to fire during the test) with a screwdriver and crimped the edges of the outer layer.

Pearson et al. argue that the October 8, 1975, telephone call between Pearson and Buergin constituted a joint conception of the invention of the counts. Their corroborating witness, Mr. E. J. Rutkowski, was present in Buergin's office at the time of the telephone call and testified to the conversation which took place between the co-inventors. Pearson et al. further argue that the successful October 16, 1975, test constituted a reduction to practice. No witness testified that he had actually seen Pearson spread the layers on the stud used in test 500. However, Pearson prepared a handwritten report on October 16 in which he stated that the layers had been spread. Additionally, Pearson et al. introduced exhibit 24, allegedly a section of one of the studs used in test 500, to corroborate the asserted reduction to practice. Rutkowski stated that he had seen exhibit 24 the day after Pearson returned to Buffalo following test 500, or very soon thereafter, and that he had examined the stud with Pearson at that time. The layers on exhibit 24 bear marks from having been physically spread apart, as with a screwdriver. Pearson et al. also allege that Knorr derived the invention from them.

Knorr alleges prior conception of the invention and also relies on test 500 for actual reduction to practice. His testimony that he conceived putting holes in the outer layer on October 8 is corroborated by Pearson. He relies on the testimony of a consulting engineer, Neal L. Peterson, to establish conception of a gap between the inner and outer layers of the stud. Prior to the unsuccessful October 8 test, Peterson was employed to scale up the design of an approved 10-foot Studco stud to the 11-foot height required in certain shaft walls in the San Francisco Embarcadero Center. He testified that he performed the calculations, assuming a 0.125 inch gap between the layers; that the assumption of a gap between

the folded over layers would tend to result in an increase in gauge thickness for any given stud height, and that this would result in increased costs. He offered no explanation for assuming a gap between the layers, but Knorr testified that he told Peterson that a gap was necessary, although no specific dimensions were communicated. Knorr also contends that Pearson et al. derived the invention from him.

Finally, Knorr takes the position that Studco's studs produced prior to October 16, 1975, would open up in a fire and produce the air passages between the layers required by the counts. In support of this argument, Knorr points out that exhibit 24, a stud section purportedly used in test 500, has a gap between the layers on both sides of the stud, although Pearson stated that he had enlarged the gap only on one side. When questioned about the gap on the second side, Pearson et al.'s witness Rutkowski stated:

Q. Now, do you have any explanations for the space on the corridor side?

A. Well, I would suspect it is due to the fire test. The expansions, the movement of the test panel, et cetera would relieve some stresses in the folded area here, the edge, and result in somewhat of an opening, as well as the wall bows in towards the fire. Normally, this would help these matters to open it up some more.

*The Decisions Below*

The board awarded priority of invention with respect to all the counts to the junior party Pearson et al. It held that Pearson et al. had conceived the invention no later than the October 16, 1975, test 500 and that they actually reduced the invention to practice on that date. The board stated:

In view of the testimony of Robert Pearson, particularly as it relates to [Pearson's handwritten report], and the stud section, [exhibit] 24, and of admissions in the senior party's brief ... to the effect that

[exhibit] 24 is a section of one of the modified studs used in the wall panel in Test 500 run on October 16, 1975 and that the gap between inner and outer layers of the flange was enlarged with a screwdriver and the flange edge crimped prior to this test, it is considered that the studs within the wall panel tested satisfy all the limitations of the counts 1 to 10.

The board further held that Knorr had not established conception of the invention of the counts prior to the termination of testing on October 16, 1975.

We do not consider that the "I" studs as produced at Studco prior to the above date included vertical air passages between inner and outer flanges. The senior party's record does not establish that Studco's studs were produced with a predetermined air passage between flanges and it would appear that any passage between flanges in a Studco stud would have been present through chance or accident. Accordingly, Knorr's idea on October 8, 1975 of putting holes in the overlapping exterior flange on the shaft wall side of his studs to vent heated gases does not mark the time at which he formulated a complete concept of the invention at issue. Knorr's idea appears to be nothing more than the desire to vent heated gases trapped in pockets between flanges.

Knorr's position that Studco's studs produced prior to October 16, 1975 would expand in a fire and would thereby provide air passages between flanges is not established, i.e. as by inter partes tests. Nor has he established his position that as of the October 16, 1975 test his belief was that in a fire a gap or passage would form between flanges of Studco's "I" stud.

Regarding consulting engineer Peterson's testimony, the board stated:

It is not considered that the testimony of Knorr and Peterson, and document KX 111 are sufficient to establish that Knorr suggested putting openings in the flanges of the studs to be used in the Embarcade-

ro Center building.  Peterson does not corroborate Knorr's testimony to the effect that he told Peterson that there must be a gap between flanges.  Peterson's testimony merely indicates that his computations assume a gap to exist between the folded over layers of the stud flanges on both the corridor and shaft sides.  Peterson does not state that Knorr instructed him to assume such a gap.

Finally, the board held that Knorr had failed to prove derivation by Pearson et al. because Knorr had failed to prove prior conception.

## OPINION

*Issues*

The issues presented on appeal are (1) whether the purported conception and reduction to practice of Pearson et al. were adequately corroborated; (2) whether Knorr was the first to conceive the invention of the counts; and (3) whether Knorr conceived and reduced to practice an invention which inherently satisfies the limitations of the counts.

*Pearson et al. Conception*

Knorr argues that the telephone conversation between Pearson and Buergin following the failed October 8 test was not adequately corroborated by Rutkowski, who was in Buergin's office when Buergin received the call from Pearson.  Rutkowski testified that when Buergin received calls from Pearson following a test, Buergin would "often talk off to the side" to him, telling him what Pearson said.  Rutkowski further testified that there was some conversation about putting a hole in the outer layer and that Buergin suggested "using something to wedge out and open that folded space on the shaft side . . . .  The idea was to get a flue or chimney action where cool air would come in and cool that face of

the stud and subsequently get a lower temperature reading on a thermocouple."

Knorr contends that Rutkowski's corroboration is hearsay, because Rutkowski could not hear both sides of the conversation.

A threshold question is whether the issue of corroboration of conception was properly raised below.  Pearson et al. note the "longstanding rule of practice that the Court of Customs and Patent Appeals will not consider issues raised for the first time which were not argued to or considered . . . below."  *Triggiana v. Gens*, 482 F.2d 1381, 1384, 179 USPQ 236, 238 (Cust. & Pat.App., 1973).  Knorr counters with the assertion that the issue was raised by the board at oral hearing, but the record does not support this, nor do counsel for Pearson recall it.  However, Knorr's brief before the board raised the issue by arguing that Rutkowski "was privy to but one side of the Pearson-Buergin telephone conversation."

Pearson et al. characterize the October 8 conversation as a "verbal act," to which the hearsay rule does not apply.  Subdivision (c) of the Advisory Committee notes to Fed.R. Evid. 801 states that the definition of hearsay includes only statements offered to prove the truth of the matter asserted, and that "[t]he effect [of the definition] is to exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights."

We are persuaded that the conversation between the coinventors was a "verbal act" affecting the legal rights of the parties.  Evidence of what the coinventors said to each other is not offered to prove the truth of the statements themselves.[3]  Whether the holes in the outer layer and the space between the layers actually function to create a "chimney effect" and cool the stud during a fire is irrelevant; rather,

---

**3.**  *Cf. Hasselstrom v. McKusick*, 51 CCPA 1008, 1014, 324 F.2d 1013, 1017, 139 USPQ 511, 515 (1963) (periodical article authored by party describing invention and published prior to filing date admissible over hearsay objection to prove statements therein were made).

the question is whether the ideas were communicated, the *communication* (as opposed to the truth) having legal significance. *See* J. Weinstein & M. Berger, 4 Weinstein's Evidence ¶ 801(c)(01) (1979); McCormick, Evidence § 249 (2d ed. 1972). Thus, Rutkowski's testimony regarding what Buergin said is not hearsay. However, as Knorr points out, Buergin's statements to Rutkowski regarding what Pearson said are statements "other than one[s] made by the declarant . . . offered in evidence to prove the truth of the matter asserted," Fed.R.Evid. 801(c), and are hearsay when offered by Rutkowski.

■ Nevertheless, we are persuaded that Rutkowski's testimony is corroborative of conception for two reasons: First, no timely objection was made to the testimony when it was offered. *Myers v. Feigelman,* 59 CCPA 834, 842 n.12, 455 F.2d 596, 602 n.12, 172 USPQ 580, 585 n.12 (1972). Second, even if the portion of Rutkowski's testimony regarding what Buergin said Pearson said were excluded, Rutkowski's testimony of what Buergin said is sufficient to corroborate that the party Pearson et al. was in possession of the invention of the counts at the time of the conversation. *Haskell v. Colebourne,* 671 F.2d 1362 (Cust. & Pat. App. 1982). As in *Haskell,* there is no issue over inventive entity in this case. Because the air space was the only portion of the invention of which Pearson was not in possession before the phone call, what Rutkowski heard Buergin say corroborates Pearson's testimony that Buergin communicated the missing element of the invention to him at that time.[4]

*Pearson et al. Reduction to Practice*

■ In order to establish an actual reduction to practice, the testimony of Pearson et al. must be corroborated by independent evidence. *Reese v. Hurst,* 661 F.2d 1222,

1225, 211 USPQ 936, 940 (Cust. & Pat.App., 1981). Contrary to Knorr's arguments, it was not necessary for Pearson et al. to produce an actual over-the-shoulder observer to satisfy the corroboration requirement; rather, sufficient circumstantial evidence of an independent nature can satisfy the corroboration rule. *Berges v. Gottstein,* 618 F.2d 771, 776, 205 USPQ 691, 695 (Cust. & Pat.App., 1980).

■ As such independent circumstantial evidence, Pearson et al. have introduced exhibit 24, a stud section which has visibly been subjected to a fire test and which also satisfies the limitations of the counts, having holes in the outer layer and a space between the inner and outer layers. It appears that the layers were spread apart, as with a screwdriver. Rutkowski authenticated exhibit 24 by testimony that he had seen it shortly after Pearson returned from California following successful test 500 and that Pearson had told him this was a section of the stud used in test 500 which he, Pearson, had modified by spreading the layers.

Assuming, arguendo, that the authenticity of exhibit 24 is before the court and has not been admitted by Knorr, we are satisfied that Pearson et al. have met their burden of persuasion on this issue. Indeed, Knorr has adduced no contrary evidence, but instead relies on arguments of counsel. However, arguments of counsel cannot take the place of evidence lacking in the record. *Meitzner v. Mindick,* 549 F.2d 775, 782, 193 USPQ 17, 22 (Cust. & Pat.App.), *cert. denied,* 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 124 (1977).

Knorr also raises the question of whether exhibit 24 is *independent* corroboration of the reduction to practice, particularly since Rutkowski was dependent on Pearson for the information that the stud was part of the wall tested in test 500 and that Pearson spread the flanges before the test. Unlike

---

4. That Pearson was in possession of the invention before test 500 is further corroborated by exhibit 24, considered *infra.*

*Reese v. Hurst, supra,* where Reese unsuccessfully argued that unwitnessed reports and notebook records and oral statements by a coinventor to third parties about what the inventor had observed constituted sufficient corroboration of reduction to practice of a process invention, exhibit 24 *itself* physically incorporates the contested limitations of the counts. Rutkowski *saw* a stud section, burned on one side, which *satisfied the limitations of the counts,* shortly after test 500 was performed. At oral argument, counsel for Knorr questioned whether test 500 constituted a reduction to practice, because a modification made by Pearson was not reported to the testing authority, is not embodied in the counts, and may have affected the test results.[5] However, Pearson's testimony that the modification would *not* affect the test results is challenged only by arguments of counsel. The testimony regarding test 500 and exhibit 24 and the exhibit itself are consistent and display an "absence of contradiction and internal conflict in the present assemblage of evidence." *Berges v. Gottstein, supra* at 775, 205 USPQ at 694. The law does not impose an impossible standard of "independence" on corroborative evidence by requiring that *every point* of a reduction to practice be corroborated by evidence having a source totally independent of the inventor; indeed, such a standard is the antithesis of the rule of reason. In view of the internal consistency of appellant's proofs, the absence of any motivation to falsify at the time of the reduction to practice, and the absence of positive evidence (as distinguished from mere arguments of counsel) supportive of Knorr's position, we hold that the October 16 reduction to practice by Pearson et al. (in test 500) was adequately corroborated by independent evidence.

*Prior Conception by Knorr*

█ We agree with the board and with Pearson et al. that the Studco studs produc-

ed prior to October 16 did not have a space between the layers of sufficient dimension to satisfy the count limitations, and, thus, fail to corroborate Knorr's alleged conception of such a space. Although Fisher, the director of the test facility, testified that there was a very small nonuniform space present between the layers of the Studco studs, this *de minimis* space is insufficient to satisfy the requirements of the counts, as is the very small space present in the physical exhibits. Further, consulting engineer Peterson's testimony fails to corroborate Knorr's conception of a gap between the layers, as Peterson did not testify that Knorr instructed him to assume such a gap.

*Knorr's "Inherent" Conception and Reduction to Practice*

Knorr argues that "[t]he senior party conceived the invention on October 8, 1975 by virtue of the 'inherency doctrine' and reduced it to practice on October 16, 1975," citing *Foss v. Oglesby,* 29 CCPA 1005, 127 F.2d 312, 53 USPQ 356 (1942). Although not conceding that exhibit 24 is available as physical evidence actually used in test 500, Knorr contends that if the exhibit is considered, "the enlarged gaps present on *both* sides of the *junior party's* Exhibit 24 stud proves conclusively the 'chimney' that inherently results when a Studco stud is subjected to the intense heat of a fire." Knorr states:

> Similarly, in the instant situation, when Knorr had the idea on October 8, 1975, of putting holes in the overlapping exterior flange on the shaftwall side of his studs to vent heated gases, the fact that he may not have formulated at that time "a complete concept of the invention at issue," does not deny his conception thereof.

> Knorr had provided a structure which would automatically provide a heat-enlargeable gap to function as an air pas-

---

**5.** Specifically, counsel for Knorr argue that a cut made in the central web nearly opposite the spot where the thermocouple was placed on the outer layer could have lowered the thermocouple temperature readings.

sage when a panel is subjected to intense heat. His idea of putting holes in the overlapping exterior flange was for the purpose of passing the E–119 test. His use of the holes was, as found by the Board, to create a venting capability. It is irrelevant that he was unaware of the exact theory by which they would function.

Knorr also relies on successful fire tests, subsequent to test 500, on Studco studs having holes in the outer layer but no enlarged space between the layers.

Considering that each count requires, as a positive limitation, a "thin, vertical passage," an "air passage," or flanges (layers) "closely spaced apart and parallel, whereby air that becomes heated will tend to move vertically upward within a gap" between the inner and outer flanges (layers), Knorr's "inherency" argument amounts to an attempt to establish reduction to practice *nunc pro tunc.*

This court has long refused to recognize attempted *nunc pro tunc* reductions to practice. In *Langer v. Kaufman,* 59 CCPA 1261, 465 F.2d 915, 175 USPQ 172 (1972), the interference count specified that the $TiCl_3$ compound have an X-ray diffraction pattern characteristic of *gamma* $TiCl_3$. In 1956, the appellant had $TiCl_3$ samples prepared and X-ray diffraction patterns photographed. At trial, appellant identified the 1956 patterns as those of gamma $TiCl_3$. This court held that the asserted 1956 conception and reduction to practice had not been established. Although the X-ray diffraction patterns proved that the gamma form had actually been prepared in 1956, they were not evidence of *appreciation,* at the time the patterns were generated, that the new form had been made. Similarly, in *Heard v. Burton,* 51 CCPA 1502, 333 F.2d 239, 142 USPQ 97 (1964), the appellant had made a naptha reforming catalyst which included a new form of alumina, *eta* alumina, but did not appreciate the existence of the new form at the time. The interference count was to a process for reforming naptha by contacting it with a catalyst comprising platinum on *eta* alumina. Although appellant argued that his process *inherently* produced *eta* alumina, and that he had a "complete concept . . . of an effective operative means, namely, an ammonia-aged alumina . . . which he found had beneficial value as a support for platinum in naptha reforming," the court decided that his failure to appreciate that he had a different form of alumina negated the definite and permanent idea of the complete and operative invention required by the patent law for conception. *Id.* at 1507, 333 F.2d at 243, 142 USPQ at 100. *See also Breen v. Henshaw,* 472 F.2d 1398, 176 USPQ 519 (Cust. & Pat.App., 1973); *Clauss v. Foulke,* 54 CCPA 1514, 379 F.2d 586, 154 USPQ 85 (1967); and *Gianladis v. Kass,* 51 CCPA 753, 324 F.2d 322, 139 USPQ 300 (1963). Where a count to a mechanical invention includes a structural feature recited as a positive limitation, conception and reduction to practice of that invention require a contemporaneous recognition of that feature.[6] Even assuming that Knorr established the inherent formation of an air passage between the flanges during a fire, his failure to appreciate that phenomenon defeats his alleged conception and reduction to practice. Knorr's subsequent recognition of the phenomenon and the subsequent successful fire tests are irrelevant.

In view of the foregoing, we hold that Pearson et al. have established by a preponderance of the evidence that they were the first to conceive and reduce to practice the invention of the counts. Accordingly, the decisions of the board in the subject interferences awarding priority of invention of all the counts to Pearson et al. are *affirmed.*

AFFIRMED.

---

**6.** *Foss v. Oglesby, supra,* involves only the question of interference in fact and does not support the proposition that "the inherency doctrine" may be used to establish a *nunc pro tunc* reduction to practice of contemporaneously unrecognized structural count limitations.