**Samuel F. KENNEDY and Duane D. Young, as Trustee of PF Trust No. 1, Plaintiffs,**

v.

**Robert WRIGHT, Individually and d/b/a New Products, Inc., and Specialized Products, Inc., Defendants.**

No. 84–3470.

United States District Court, C.D. Illinois, Springfield Division.

Jan. 11, 1988.

ized Products, alleging the latters' infringement of United States patents 3,583,112 and 4,073,110 in violation of Title 35. The patents, which cover designs for a roof and floor used in the construction of grain bins, were issued to Kennedy in 1971 and 1978 respectively. On August 15, 1983, he assigned title in the patents to Young, an attorney, under a trust established for the avowed purpose of funding this litigation.

Defendants have denied the charge and counterclaimed, asserting, *inter alia*, ownership of the patents. They contend Specialized Products obtained equitable title in the patents by purchasing the assets of Kennedy's former business, New Products, during its 1982 bankruptcy liquidation. Kennedy was purportedly the alter ego of his now defunct enterprise. Accordingly, Defendants request a declaratory judgment under 28 U.S.C. § 2201 that Plaintiffs hold legal title in constructive trust for their benefit.

Plaintiffs, however, maintain the bankrupt concern had only a license to produce the patented goods which Kennedy, as licensor, revoked prior to the sale. They insist both legal and equitable title rests in them alone.

The Court bifurcated the question of equitable ownership from the remaining claims and set the former for bench trial. Evidence was taken in August 1987 and final written arguments have been submitted. From a plethora of testimony and exhibits, two issues arise:

(1) Who owned equitable title to the patents before the bankruptcy proceeding—Samuel Kennedy or New Products?

(2) If the latter, did its interest pass to Specialized Products as a result of the assets purchase agreement?

The District Court's power to determine title as between the litigants resides in common-law equity jurisdiction. *North Branch Prod., Inc. v. Fisher,* 284 F.2d 611, 614 (D.C.Cir.1960), *cert. denied,* 365 U.S. 827, 81 S.Ct. 713, 5 L.Ed.2d 705 (1961) (action for declaration of patent ownership). Set forth here are the Court's findings of fact and conclusions of law in com-

Richard L. Wood, Chicago, Ill., and Verne H. Evans, Springfield, Ill., for plaintiffs.

Daniel W. Austin, Ronald D. Spears, Taylorville, Ill., Irving Powers and Edward J. Hejlek, St. Louis, Mo., for defendants.

## OPINION ORDER

MILLS, District Judge:

A patent dispute.

The "alter ego" doctrine.

And equity considers done that which ought to be done.

Samuel Kennedy and his assignee, Duane Young, filed this lawsuit against Robert Wright and his corporation, Special-

pliance with Fed.R.Civ.P. 52. In reaching a decision, it is mindful that "[o]ne who lays claim to property held by another under a theory of constructive trust arising from a confidential relationship is charged with the duty of establishing such trust by clear and convincing proof." *National Waste Co. v. Spring Packing Corp.*, 200 F.2d 14, 16 (7th Cir.1952), *cert. denied*, 345 U.S. 909, 73 S.Ct. 649, 97 L.Ed. 1344 (1953) (suit alleging patent ownership arising from fiduciary duty and contractual obligation to assign). *See also In re Stiennon*, 73 B.R. 905, 907 (Bankr.W.D.Wis.1987); Restatement (Second) of Trusts § 40(d) (1959).

### FINDINGS

Samuel Kennedy incorporated New Products in February 1961 for the principal purpose of manufacturing grain bins and related accessories. From its beginning until the company became a wholly-owned subsidiary of S.F. Kennedy Industries, a public corporation, in 1973, he and his wife owned between 99–100% of the outstanding stock. During the period from 1973 to 1981, they held approximately 85% of Industries' shares with Kennedy alone owning around 78%. The two often guaranteed loans to the businesses. Kennedy himself gave loans to New Products.

Kennedy served as chairman of the board, president, and treasurer of both corporations from their inception. Although he attempted to downplay his position of authority at trial, Kennedy admitted involvement in design as well as administrative matters. He described himself as "chief, cook, bottle washer, and owner."

#### A. *Roof Patent*

Kennedy applied for the roof patent in January 1970. Letters were issued in his name on June 8, 1971. According to his testimony, he conceived the invention off corporate premises during non-working hours. New Products, however, paid the fees and costs in preparation for the patent. This is undisputed. The development and testing of the invention's prototypes also occurred on company property, with its materials and labor, and at its expense.

While Kennedy stated he reimbursed the business for the cost of the patent and claimed the amount as a deduction on his tax return, he failed to produce any documentary evidence to support his self-serving assertions. The Court does not believe that Kennedy ever repaid the money. This finding is buttressed by Industries' 1973 tax return reflecting the corporation's amortization of patent expenses.

Once the new roof was ready for production, Kennedy purportedly granted New Products an "oral royalty-free non-exclusive license" to manufacture it. But again, no evidence aside from Kennedy's word was proffered to reflect this understanding. This arrangement continued for two years until on June 20, 1973, he and his company entered into a written license agreement providing for the payment of royalties. Oddly enough, New Products had gone public just three months earlier. Perhaps the license made it possible for Kennedy to obtain funds from the public corporation without shareholder approval. Royalties were paid initially but credited to Kennedy as book entries for the years preceding New Products' bankruptcy.

Kennedy's correspondence to competitors regarding the roof patent was ambiguous as to who actually owned it. His letters referred both to "my patent" and "our patent." When the business went public, the prospectus admittedly stated that he alone owned the patent. New Products' advertising, however, consistently indicated company ownership.

#### B. *Floor Patent*

Kennedy filed his application for the floor patent in September 1976 and was issued letters on February 14, 1978. He admitted that New Products tendered all costs in bringing his second invention to bear. He offered only his testimony that the expenses were repaid, while Defendants submitted a company worksheet showing its amortization of the figures.

Unlike the patented roof, Kennedy never contemplated a written license for production of the new floor. Kennedy testified that both he and New Products understood

their prior agreement to cover the floor as well as the roof. All this means is that Kennedy agreed with himself. The language of the license cannot possibly be construed to include the floor patent. The company's complete failure to pay any royalties for use of the patent illustrates the lack of a contract. No records were ever produced to substantiate Kennedy's claim that royalties accrued on the corporate books but were not paid due to the business' financial condition.

New Products obtained a Federal Trademark Registration for "Box–Lox" to promote the patented floor. Kennedy was personally involved in acquiring this for his company. Thereafter, New Products promoted the floor as an exclusively owned product.

## C. *Bankruptcy*

Despite Kennedy's contrary assertions, the roof and floor designs were undoubtedly critical to the success of New Products. The 1975 S.E.C. 10K report indicated that the company's principal activity was selling grain bins and related accessories. Kennedy acknowledged the sales schedule for the nine months ending in August 1982 was exemplary of the typical sales for New Products. That document shows 68% of its gross sales resulted from customer purchases of grain bins made with the patented materials.

But business was not strong enough. On July 17, 1981, New Products and its parent, S.F. Kennedy Industries, filed Chapter 11 petitions in bankruptcy which were subsequently converted to Chapter 7. On August 20, 1982, Defendant Wright and the bankruptcy trustee agreed upon the sale of certain assets to Specialized Products in exchange for $1,250,000. The transfer included:

C. All work in progress and open orders as of August 23, 1982, at 12:01 a.m. C.D.T.

D. Any and all patents or trademarks owned by S.F. Kennedy Industries, Inc., and S.F. Kennedy New Products, Inc., that are any way involved in the operations of the business located on the said premises and any licensing agreements for the manufacturing of the adjustable roof assembly for grain bin roofs.

Earlier that day, Kennedy attempted to terminate the written license agreement pursuant to its terms by serving written notice upon the trustee. Wright, President, and Steven Gregory, Vice–President of Specialized Products, testified they believed New Products owned all rights necessary to allow their business to continue manufacturing the patented floor and roof following the sale of assets. Otherwise, the transaction would have been worth little to them.

## APPLICABLE LAW

An initial question before the Court is whether state or federal law governs this controversy. Where the law is dominated by a federal statutory scheme, as are United States patents under Title 35 of the Code, a strong argument may be made that federal common law should control in the absence of a specific Congressional mandate. *See Unarco Indus. v. Kelley Co.,* 465 F.2d 1303, 1305–06 (7th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973) (question of assignability of patent license involved policy behind federal patent law and therefore federal common law applied). On the other hand, at least one federal court has expressly determined that under the *Erie* doctrine the issue of patent ownership between an individual and corporation depends upon state law. *Standard Brands, Inc. v. United States Partition & Packing Corp.,* 199 F.Supp. 161, 176 (E.D.Wis.1961). The dispute, however, appears academic for this Court can discern no difference in the law applied by the apposite decisions of the respective jurisdictions. *See e.g., E.F. Drew & Co. v. Reinhard,* 170 F.2d 679, 682 (2d Cir.1948) (per L. Hand, J.) (no substantial difference exists between federal law on subject of patent ownership and that of the state).

## A. *Ownership*

■ Absent an agreement to convey, an employee is entitled to ownership of inven-

tions relating to the employment. *See generally* Annotation, *Right to Inventions as Between Employer and Employee*, 16 A.L.R. 1177 (1922). Even where the employee utilizes company time and facilities in perfecting the patent, the employer has at most a shop right—a royalty-free, non-exclusive and non-assignable license to use the invention. Restatement (Second) of Agency § 397 comments b & c (1958). *See generally* Annotation, *Application and Effect of "Shop Right Rule" or License Giving Employer Limited Right in Employees' Inventions and Discoveries*, 61 A.L.R. 2d 356 (1958).

Yet an agreement to assign the invention need not be expressly found among the terms of an employment contract. As Judge Learned Hand stated:

> [I]t is uniformly held that an employee, and a fortiori a partner [or in this instance a principal shareholder and director], may promise that he will assign all inventions which he may make, and the courts ... enforce such contracts specifically. Nor need the contract be express any more than any other contract; as the Restatement of Agency well puts it: "For the employer to be entitled to a patent it is not necessary that the contract should specifically so provide." *It "is a question to be decided upon all the facts of the individual case." In short, such a contract may be implied from the relations of the parties.*

*E.F. Drew*, 170 F.2d at 682 (emphasis added). Thus, where the inventor is more than an employee and occupies a special relationship of trust and confidence to the business, courts under certain circumstances have held it inequitable for the individual to retain a title which more properly belongs to the company. In such instances, the fiduciary agent will be compelled to assign the patent. *See e.g., Grip Nut Co. v. Sharp*, 150 F.2d 192 (7th Cir.), *cert. denied*, 326 U.S. 742, 66 S.Ct. 55, 90 L.Ed. 443 (1945) (president and general manager of corporation stood in confidential relationship to employer and could not act for his own exclusive benefit in taking patents he developed; rather, he held patents as con-

structive trustee for company); *Lefiell v. United States*, 162 Ct.Cl. 865 (1963) (president, general manager and principal stockholder of company who used its money and facilities in developing and obtaining patent held to be alter ego and constructive trustee of company); *North Branch Prod., Inc., v. Fisher*, 131 U.S.P.Q. 135 (D.D.C.1961), *aff'd*, 312 F.2d 880 (D.C.Cir.1962), *cert. denied*, 373 U.S. 913, 83 S.Ct. 1302, 10 L.Ed. 2d 413 (1963) (company entitled to patent ownership where patentee was principal shareholder, general manager and director in charge of entire operation). *See generally* 56 C.J.S. *Master and Servant* § 73 (1948).

The leading case on the subject may be *Dowse v. Federal Rubber Co.*, 254 F. 308 (N.D.Ill.1918). Dowse was president, director, and general manager of a tire manufacturing business when he applied in his own name for a patent covering a new tire design. The evidence showed Dowse to be in complete control of operations during the invention's development. All expenditures relating to the patent were paid by the company (although Dowse claimed otherwise) and it advertised the product as its own. The tire was vital to the corporation's success. Describing the issue as whether the patent equitably belonged to the corporation, the Court reasoned:

> The all-important question is Dowse's relation to the tire-manufacturing business. If he was only a hired man, taking orders as to his work from another ... the invention belonged to him, leaving only an implied license or shop right to the corporation....
>
> He did not expressly contract as a part of his duties to design new tires; but if he did so agree in substance, and was more than a mere employee, having the main responsibility to make the business successful, then he should be compelled to assign the patent....
>
> So the real test is whether Dowse occupied such a relation to the corporation that he was its alter ego in such a capacity that it is only consistent with good faith that he should recognize its ownership of the patent issued to him.

*Id.* at 309–10. The Court subsequently entered a decree adjudging the company the equitable owner of the patent and directing Dowse to assign it legal title.

■ This Court must reach a like conclusion in the case at bar. Kennedy was New Products. He took orders from no one. His executive control and authority was exclusive. While serving as president, treasurer, and chairman of the board, Kennedy applied for and was issued the roof and floor patents. He used company finances and facilities to bring about the inventions. It paid the costs and fees necessary to secure the patents and was never reimbursed.

Kennedy treated the patents as if his business owned them. Although New Products continually produced and sold the floor structure, at no time did the company have a license to do so. Nor did it ever pay Kennedy any royalty for the privilege of manufacturing the good. The license providing for the production of the roof was a sham. Not until Kennedy decided to take his business public did he feel the need for an agreement. Even then, few royalties were tendered. Instead, New Products simply accumulated them on the books.

Both patents were manifestly important to the financial well being of the company. Through an advertising campaign in which it represented exclusive ownership of the patents, sales of grain bins consisting of the patented structures came to represent *two-thirds* of New Products' business.

On the basis of the evidence presented to this Court, it must conclude that the company, in fact, owned the patents. Samuel Kennedy was clearly the alter ego of New Products. "When one legal entity is but an instrumentality or alter ego of another by which it is dominated, a court may look beyond form to substance and may disregard the theory of distinct legal entities in determining ownership of assets." *In re Eufaula Enter., Inc.,* 565 F.2d 1157 (10th Cir.1977).

**B.** *Passage of Title*

■ Having decided the issue of ownership, the question concerning what Special-

ized Products actually received from New Products during the latter's bankruptcy liquidation is simple. The language of the assets purchase agreement controls. It provided for the transfer to the buyer of "any and all patents" owned by New Products. This included United States Patents 3,583,112 and 4,073,110.

Kennedy points to the words in the same paragraph of the contract purporting to transfer the roof license as proof that Defendants knew he owned the patents. His conclusion, however, is not so clear. At the time of the sale, no one could be sure—based upon Kennedy's handling of corporate affairs—whether he or his company was entitled to the patents. Wright merely exercised good business judgment in accounting for all possibilities. As the bankruptcy judge said: "You are going to take what you get."

What Defendants got was equitable title in the patents.

## CONCLUSION

*Ergo,* pursuant to 28 U.S.C. § 2201, the Court hereby DECLARES Defendants, Robert Wright and Specialized Products, Inc., to be the equitable titleholders of United States Patents 3,583,112 and 4,073,110. Plaintiffs, Samuel Kennedy and Duane Young, trustee of PF Trust # 1, as constructive trustees of the roof and floor patents, are ORDERED to assign legal title to Defendants within sixty (60) days herefrom.

The litigants' remaining claims are DISMISSED as moot.

SO ORDERED.