**In re STONECRAFT, LLC.**

**Stonecraft, LLC, Plaintiff,**

v.

**John Slagter, Defendant.**

**Bankruptcy No. 03–05229.
Adversary No. 03–00173.**

United States Bankruptcy Court,
S.D. Mississippi.

March 7, 2005.

William J. Little, Jr., Lentz & Little, P.A., Jackson, MS, for Plaintiff.

John Slagter, Grand Rapids, MI, pro se.

*OPINION*

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is the complaint filed by the plaintiff, Stonecraft, LLC, (Stonecraft), against the defendant, John Slagter (Slagter); answer and affirmative defenses having been filed by the defendant; and the court, having heard and considered same at an evidentiary trial, hereby finds as follows, to-wit:

## I.

*JURISDICTION*

The court has jurisdiction of the subject matter of and the parties to this adversary proceeding pursuant to 28 U.S.C. § 1334 and § 157, in addition to the General Order of Reference entered by the United States District Court on July 27, 1984. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B), (E), and (O).

## II.

*PRE–TRIAL ORDER SUMMARIES AND STIPULATIONS*

As a part of the pretrial order, entered in this proceeding on January 14, 2005, the parties set forth a concise summary of their respective positions as follows:

1.  Plaintiff: In November, 1995, Stonecraft, LLC was formed to develop, manufacture, market and sell flexible concrete composites to be used as building materials. John Slagter was designated as the Manager of the limited liability company under the Operating Agreement. Stonecraft initially sought to develop building materials made of a fiber

reinforced cement composite which would be extruded using a license from Northwestern University. In late 1997, Slagter advised the members that the fiber reinforced cement product was not viable and suggested that Stonecraft develop a product which did not use fibers and had higher ratios of latex to cement than the fiber reinforced cement composite. During 1998, with the assistance of Dr. Dale DeFord, Stonecraft developed a commercially viable polymer cement composite.

In March, 1999, patent attorneys for Stonecraft filed a provisional application for a patent with the United States Patent and Trademark Office. At Slagter's direction, Slagter was designated as the inventor of the product and processes falling within the scope of the Patent.

During the almost three and a half year period from the formation of Stonecraft until the filing of the Provisional Patent Application, Stonecraft accumulated significant debt, and the members, other than Slagter, had contributed 1.5 million dollars in capital. In May, 1999, an additional million dollars in capital was invested by the members, except Slagter. However, by October, 1999, Stonecraft was still experiencing difficulties manufacturing the polymer cement composite. The members had questions concerning Slagter's ability to manage the company and were unwilling to invest additional capital. From November, 1999 until mid-March, 2000, Slagter and the members negotiated an Amended and Restated Operating Agreement pursuant to which the members, other than Slagter, would contribute an additional one million three hundred thousand dollars in capital, and the company would be run by an executive committee consisting of Milt Kuyers and Slagter, pursuant to which Slagter would retain authority over day to day operations of the company, but Kuyers had the right to participate in Stonecraft management decisions.

By the end of May, 2000, the Company was still experiencing problems with the polymer cement composite despite representations by Slagter that these problems would be solved. Additionally, it was verified that Slagter had been using company funds and employees for his personal use, and in June, 2000, the members requested Slagter to resign as manager of the company, but continue to act in a "founder" status and continue to be paid his salary. Slagter refused this offer, and he was terminated for cause. After he was terminated, Slagter claimed that he was the sole inventor of the product and processes falling within the scope of the Patent and refused to execute an assignment which Kuyers had been requesting Slagter to execute since March, 2000.

2. Defendant: Stonecraft, LLC, was organized for the purpose of manufacturing, marketing, and selling building materials made of a fiber reinforced Portland cement composite material. The technology that is the subject of this Adversary Proceeding is not a fiber reinforced Portland cement composite and, as such, is not a technology essential to the business of Stonecraft.

From the inception of the company until June 6, 2000, John Slagter was employed by Stonecraft to manage the business and affairs of the company in general, and was never employed specifically to invent the technology that

is the subject of this Adversary Proceeding.

Management of Stonecraft is vested in the members and John Slagter's employment was subject to the control of the members. There is no express agreement between John Slagter and Stonecraft regarding an assignment of patent rights. There is no implied-in-fact contract between John Slagter and Stonecraft regarding an assignment of patent rights. Slagter did not have a fiduciary duty to assign his patent to Stonecraft.

This bankruptcy case was filed for the purpose of transferring the assets of Stonecraft to MK Leasing Company, which is a company owned by the members in control of Stonecraft. The members of Stonecraft have engaged in willfully unfair and oppressive conduct toward John Slagter, and have acted in bad faith.

In addition, as a part of the aforementioned pretrial order, the parties stipulated to the following facts:

1. In 1991, Slagter formed Stonecraft, Inc., a Michigan business corporation.

2. Stonecraft, Inc.'s, place of business was in a warehouse located on Logan Street in Grand Rapids, Michigan.

3. In the summer of 1995, Slagter solicited investments from a group of businessmen in the Grand Rapids, Michigan area.

4. Stonecraft, LLC, was organized as a Michigan Limited Liability Company on November 1, 1995.

5. The members of the Company entered into an Operating Agreement which became effective November 1, 1995.

6. The Operating Agreement designated Slagter as the Manager.

7. Stonecraft commenced business operations in 1996.

8. In connection with the formation of Stonecraft, LLC, Stonecraft, Inc., changed its name to Slagter, Inc., effective November 1, 1995.

9. Stonecraft, LLC, obtained a license agreement from Northwestern University permitting it to use a proprietary extrusion process that would be useful in making building materials from the fiber-reinforced Portland cement composite.

10. Effective April 23, 1996, the members executed an Operating Agreement, Subscription Agreement, Employment Agreement and related documents pursuant to which an additional $475,000.00 was invested in Stonecraft.

11. Effective August 1, 1996, the members executed an Operating Agreement, Subscription Agreement, Employment Agreement and related documents pursuant to which an additional $500,000.00 was invested in Stonecraft, LLC.

12. In late 1997, Slagter proposed to the members that Stonecraft, LLC, should begin efforts to evaluate a polymer-cement composite product.

13. In February, 1998, Stonecraft, LLC, entered into an employment agreement with Dr. Harvey Dale DeFord, and Dr. DeFord began working at Stonecraft, LLC.

14. DeFord prepared a draft of a patent application for the polymer-cement composite which included the chemical formulae, data tables and graphs necessary for the patent application.

15. This information and other information was provided to patent at-

torneys, who filed a U.S. Provisional Patent Application which was assigned serial number 60/125,327("327 Application").

16. The 327 Application was filed on March 19,1999, designating Slagter as the inventor.

17. Significant development and testing of the polymer-cement composite was performed by employees and consultants retained by Stonecraft, LLC.

18. Some of the equipment and materials utilized in the development and testing of the polymer-cement composite was paid for by Stonecraft, LLC.

19. On March 23, 1999, Stonecraft, LLC, attended its first industry trade show where it displayed floor tiles and other building products made of the polymer-cement composite material.

20. On May 20, 1999, an Amended and Re-stated Operating Agreement was executed pursuant to which an additional $1,000,000.00 in capital was invested.

21. Stonecraft, LLC, experienced problems with efflorescence, which further delayed introduction of the product into the commercial market.

22. In late October, 1999, Milton Kuyers, who was the Trustee of a family trust which held a membership interest in Stonecraft, LLC, contacted Bob DeJong at the Miller Canfield law firm in Grand Rapids, Michigan concerning a dispute between Slagter and the other members of Stonecraft, LLC.

23. Kuyers requested Bob DeJong to represent Slagter in connection with the dispute between Slagter and the members, and Bob DeJong obtained a waiver from Slagter and all of the members, except possibly one, concerning any potential conflicts of interest.

24. Slagter and the members engaged in negotiations from November, 1999, through March, 2000.

25. On March 6, 2000, a mediation occurred at which time an agreement resolving the dispute was reached.

26. On March 17, 2000, patent attorneys filed a U.S. Non-Provisional Patent Application based upon the 327 Application.

27. The Non-Provisional Patent Application was assigned serial number 09/528,336("336 Application").

28. As with the 327 Application, the 336 Application was filed naming Slagter as the inventor.

29. In addition to the 336 Application, patent attorneys filed a Patent Cooperation Treaty International Application.

30. This Application was assigned number PCT/US00/07192 ("PCT Application").

31. On March 20, 2000, Stonecraft, LLC, held a scheduled members meeting.

32. At the member's meeting, it was unanimously agreed that Stonecraft, LLC, would enter into a Second Amended and Re-Stated Operating Agreement.

33. The members established an executive committee consisting of Milt Kuyers ("Kuyers") and Slagter.

34. Another members meeting was held on June 5, 2000, at which Slagter was terminated.

35. Kuyers was appointed as the managing member by the members.

36. John Slagter is an inventor of the technology described in the patent application. (It is disputed as to whether Slagter is the sole inventor.)

37. Milton Kuyers was provided a copy of the Patent Application before he signed the most recent version of the Stonecraft, LLC, Operating Agreement in the Spring of 2000.

38. Edward J. Talen, Jr., was provided a copy of the Patent Application before the most recent version of the Stonecraft, LLC, Operating Agreement was executed in the spring of 2000.

39. Prior to March 2000, Milton Kuyers discussed allegations of mismanagement and misuse of company funds by John Slagter with Robert DeJong.

## III.

### *PATENT DESCRIPTIONS*

The patent filings, relevant to this adversary proceeding, began with the filing of a Provisional Patent Application, USSN60/125,327, on March 19,1999. (Exhibit P27) Thereafter a Non–Provisional Application, USSN09/528,336, was filed on March 17, 2000. (Exhibit P–30) It has now become United States Patent No.: US 6,569,923B1, issued on May 27, 2003. (Exhibit P46)

Ancillary to the aforementioned patent is a Patent Cooperation Treaty Request, PCT/US00/07192, which was filed on March 17, 2000. (Exhibit P31) Other international patent applications are the following: Canadian Patent Application No. 2,367,798 (Exhibit P40); European Patent Application No. 00918106.6 (Exhibit P41); Japanese Patent Application No.2000–606544 (Exhibit P42); and Mexican Patent Application No. PA/a/2001/009447 (Exhibit P43). Finally, an international application published under the Patent Cooperation Treaty (PCT), No. W0 00/56679, was issued September 28, 2000. (Exhibit P–44)

In this opinion, for purposes of simplicity, the aforementioned documents will be referred to as "patent," or when making reference to the Patent Cooperation Treaty Request and the international applications, "PCTs."

## IV.

### *DISCUSSION OF ISSUES AND FIDUCIARY DUTY*

In this proceeding, the court must determine whether the subject patent is lawfully owned by Stonecraft or Slagter. Relative to this determination are the following questions:

1. What was Slagter's legal relationship to Stonecraft? That is, was Slagter a mere employee of Stonecraft or did he occupy a fiduciary relationship to Stonecraft?

2. Since the act of invention includes the two basic steps of (1) conception and (2) reduction to practice, when did the invention, which is the subject matter of the patent, actually come into being?

The general rule is that an inventor owns the patent rights to an invention even though the invention was conceived and/or reduced to practice while the inventor was employed. There are three well recognized exceptions to this general rule:

1. The parties can expressly contract that any ownership rights will vest in the employer.

2. The employer will have ownership rights to the invention if the employee was specifically hired to exercise his/her inventive faculties to create the resulting invention.

3. Even if the employer does not have ownership rights in the invention, it may still have a non-exclusive, non-transferable, royalty free license, known as a "shop right," to use the patented invention.

■ The general rule, however, does not apply to a situation which is found to be outside a true employee-employer relationship. For example, the following comments were extracted from the "American Intellectual Property Law Association Quarterly Journal," to-wit:

> Outside of the employment relationship, an employer may be the beneficial owner of a patent for an invention made by a person who occupies a position of special trust in the employer organization, such as a director or officer. That person may be under a fiduciary duty to assign the patent to the employer.

18 AIPLA Q.J. 127, 132 (1990).

> It is generally accepted that a person who functions, *at the time of the invention,* in a fiduciary capacity in a business organization, may be under an obligation, in the absence of agreements to the contrary, to assign any patents resulting from the invention to the organization. That person need not be an employee, and need not have been hired to invent. Thus, where the inventor is more than an employee and occupies a special relationship of trust and confidence to the business, courts under certain circumstances have held that it would be inequitable for the individual to retain a title which more properly belongs to the company. In such instances, the fiduciary agent will be compelled to assign the patent.

*Id.* at 147 (emphasis supplied).

■ Several factors may be applied by a court to determine if a fiduciary should be required to assign a patent to his or her employer, to-wit:

1. That the fiduciary, i.e., the president, CEO, manager, etc., was the "alter-ego" of the company.

2. The patent was obtained in the company's name.

3. Products based on the invention were marketed as the company's products.

4. No license agreement was executed between the inventor/fiduciary and the company.

5. The inventor led the company to believe that the patent was a company asset.

6. The fiduciary usurped a corporate opportunity by asserting control of a patent to the detriment of the company.

*See, Dowse v. Federal Rubber Co.,* 254 F. 308 (N.D.Ill.1918); *Kennedy v. Wright,* 676 F.Supp. 888 (C.D.Ill.1988); and *Great Lakes Press Corp. v. Froom,* 695 F.Supp. 1440 (W.D.N.Y.1987).

See also, *Grip Nut Co. v. Sharp,* 150 F.2d 192 (7th Cir.1945), where the court determined that the president and principal executive of the company owed a duty of fidelity to the company and held patents as a constructive trustee for the company; and *Edwards v. Gramling Engineering Corp.,* 322 Md. 535, 588 A.2d 793 (1991), where the court held that a shareholder, director and officer of the corporation breached his fiduciary duty to the corporation by having a patent issued in his own name without the corporation's consent, and by exerting control over the patent inconsistent with the corporation's interest.

In *Fletcher Cyclopedia of the Law of Private Corporations,* the following comment can be found:

> Where evidence sufficiently establishes that a shareholder/director of a closed

corporation breached his or her fiduciary duty to the corporation by obtaining a patent in that officer's own name without the corporation's consent and by exerting control over that patent inconsistent with the corporation's interests, the Court may properly assign the patent to the corporation, enjoin the officer not to engage in any activity related to the patented object, and require the officer to turnover objects used to manufacture the patented object. This is so because an officer of a corporation has a fiduciary duty to act in good faith and in a manner reasonably believed to be in the best interest of the corporation and all of its shareholders. Thus, the president of a corporation has a fiduciary duty to assign any rights in a patent for an invention he worked on while president of the corporation.

*3 Fletcher Cylopedia of the Law of Private Corporations,* § 893 (footnotes omitted).

■ As noted hereinabove, the first issue that this court must decide is whether Slagter occupied a fiduciary relationship to Stonecraft.

As set forth in Exhibit P3, Slagter was designated as the Manager of Stonecraft on November 1, 1995. He was a member of the company holding a twenty percent interest and earned a salary of $5,000.00 per month. Depending on the earnings and performance of the company, Slagter could have actually become the majority owner. Slagter's general responsibilities as Manager were set forth in § 7.08 of the Operating Agreement, as follows:

7.08 *Manager.*

The Manager shall, subject to the control of the Members, in general, supervise and control all of the business and affairs of the Company. He shall have authority, subject to such rules as may be prescribed by the Members, to appoint such agents and employees of the corporation as he shall deem necessary, to prescribe their powers, duties and compensation, and to delegate authority to them. Such agents and employees shall hold office at the discretion of the Managing Member. He shall have authority to sign, execute and acknowledge on behalf of the Company, all deeds, mortgages, bonds, contracts, leases, reports and all other documents or instruments necessary or proper to be executed in the course of the Company's regular business, or which shall be authorized by resolution of all the Members, and except or otherwise provided by law or resolution of the Members, he may authorize any other officer or agent of the Company to sign, execute and acknowledge such documents or instruments in his place and stead. In general, he shall perform incident to the position of Manager and such other duties as may be prescribed by the Members of the Company from time to time.

Without doubt, Slagter was in charge of the day to day operations of Stonecraft. He made practically all of the decisions that affected the company's activities. He hired employees and consultants, as well as, terminated employees without the authority of the other members. One of the individuals that he hired and fired was Dr. H. Dale DeFord, who played a significant role in the development of the subject patent.

According to his own testimony, Slagter considered himself to be synonymous with Stonecraft. The range of authority exercised by Slagter from the time that he came "on board" with Stonecraft in November, 1995, until early 2000, convinces this court that he could easily be labeled the "alter-ego" of Stonecraft.

When Slagter realized that the extrusion difficulties in producing the fiber reinforced cement composite could not be easily resolved, he effectively made the decision to turn Stonecraft's direction to the polymer cement composite beginning in late 1997. This development culminated in the filing of the Provisional Patent Application in March, 1999. A more detailed discussion of this development, including the involvement of Dr. DeFord, will be addressed herein below.

It is undisputed that the polymer cement composite became the single focus of Stonecraft's manufacturing operations. While the development of this product was ongoing and even up to March, 2000, Slagter never revealed to any of the other Stonecraft members that he intended to designate himself as the "inventor" of the composite and the related processes to the exclusion of the company. Indeed, the court is convinced that all of the other members thought that the product belonged to the company. This is certainly understandable since Stonecraft paid for every expense related to the product's development and patenting. This includes, but is not limited to, the cost of the materials involved, the related labor, consultant salaries, and the fees necessary to prosecute the patent application. In the opinion of the court, the ownership of the patent was a "non-issue" until the relationship between Slagter and Stonecraft began to unravel in the Spring of 2000.

Considering the duty of loyalty of a manager to a limited liability company, the court examined a treatise entitled "Limited Liability Companies: Tax and Business Law," which offers the following comment:

> The duty of loyalty is a duty of selflessness. A manager's personal interest must yield to the interest of the organization. A manager may profit from its role in the business if the organization has given informed consent, or, in some circumstances, if the manager can establish that its conduct was fair to the organization. Otherwise, the manager must eschew all financial benefits, opportunities, and other advantages connected with the business.

Carter G. Bishop & Daniel S. Kleinberger, *Limited Liability Companies: Tax and Business Law* ¶ 10.01[1][b] (2004) (footnotes omitted).

The treatise cites § 450.4404(1) of the Michigan Limited Liability Company Act (MLLCA) which provides that a manager of a limited liability company must discharge his or her duties as a manager, "in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interest of the limited liability company." As such, the MLLCA expressly incorporates the duty of loyalty on the part of the manager to the limited liability company.

In this context, the court examined § 450.4404(5), MLLCA, which provides as follows:

> Except as otherwise provided in an operating agreement or by vote of the members pursuant to section 502(4) and (7), *a manager shall* account to the limited liability company and *hold as trustee for it any profit or benefit derived by the manager from any transaction connected with the conduct* or winding up of *the limited liability company* or from any personal use by the manager of its property. (emphasis supplied)

In order to be able to retain any benefits from a transaction connected with the limited liability company, the manager must comply with § 450.4502(5), MLLCA, which provides as follows, to-wit:

(5) Unless authorized in advance by an operating agreement, a transaction with the limited liability company or a transaction connected with the conduct or winding up of the limited liability company in which a manager of the limited liability company has a direct or indirect interest or a manager's personal use of property of the limited liability company may be authorized or ratified only by a vote of the disinterested members entitled to vote. *The manager shall disclose all material facts regarding the transaction and the manager's interest in the transaction or all material facts about the personal use of the limited liability company's property before the members vote on that transaction* or use. (emphasis supplied)

Obviously, the disinterested Stonecraft members did not affirmatively vote to allow Slagter to obtain the patent in his name to the exclusion of Stonecraft.

The court carefully considered *Detroit Testing Laboratory v. Robison,* 191 N.W. 218, 221 Mich. 442 (1922), which was decided over seventy years prior to the enactment of the MLLCA. In this particular case an inventor, Robinson, was permitted to retain his patented invention against the claim of his former employer, even though he was a manager and vice-president of the employer. The court is of the opinion that not only are the factual circumstances of *Detroit Testing Laboratory* distinguishable from the facts pertinent to the present proceeding, the enactment of § 450.4404(5), MLLCA, as a matter of law, codified that a manager of a limited liability company "shall account to the limited liability company and hold as trustee for it any profit or benefit derived by the manager from any transaction connected with the conduct" of the limited liability company.

In *Detroit Testing Laboratory,* the court pointed out that the inventor had paid for the use of his employer's equipment, and, *more importantly,* that the invention was not essential to the conduct of the business carried on by the employer. In the proceeding before this court, not only has Slagter paid for nothing, but the invention, the polymer cement composite, is the "heart and soul" of Stonecraft's prospective business.

The Business Plan (Exhibit P–1) was prepared by Slagter in April, 1995. It was utilized to attract the initial investors to Stonecraft and contained the following information concerning patent protection:

### PATENT PROTECTION

Stonecraft, Inc. has retained the services of John Waters a patent attorney. Mr. Waters has conducted patent searches on Stonecraft's material and indicates that substantial patent protection should be available. Mr. Waters is currently in the process of applying for patents with the United States Patent Office to secure these concepts. The Center for Advanced Cement Based Materials (ACBM) at Northwestern University has applied for the use of a patent for the unique extrusion technology they have developed. ACBM has agreed to enter into an agreement with Stonecraft, Inc. to use this technology in exchange for compensation to fund further research at ACBM. It is not clear that ACBM's patented concepts are necessary to manufacture but the technical prowess of this institution warrants a cooperative arrangement approach to this matter.

Until such time as patent protection is obtained, the unique concepts presented in this Business Plan have been protected as trade secrets, and persons who receive information on the product are

required to sign a confidential disclosure agreement.

This language is clearly an insinuation by Slagter to the prospective investors that patent protection would be available for the products that would be produced in the future by Stonecraft. While everyone acknowledges that Stonecraft's initial focus on product development was the fiber reinforced composite, early documents also mentioned the polymer cement product. Therefore, the latter cannot be excluded from the parameter of the "Patent Protection" paragraph.

In this context, the court would also mention a memorandum to the members prepared by Slagter on February 20, 1998 (Exhibit P–10), where he stated the following:

*Product*

The Product and Process are in great shape!

-The latex modified cement product is testing out much better than the fiber material.

*Patenting*

We are currently working with a patent attorney to consider applying for patent protection for *our material.* I will notify Northwestern University that we will not utilize our license with them when our attorney believes the timing is right. (emphasis supplied)

Clearly, Slagter had to be referring to the patenting of the polymer cement composite because only the extrusion process for the fiber reinforced cement composite required licensing from Northwestern University. The language in this memorandum would certainly not be indicative to the members that Slagter had the intention of retaining a patent as his own.

Milt Kuyers, one of the Stonecraft members, testified that he thought that the language "our material" referred to the latex modified cement product which did not require fiber. Typifying the message that Slagter was conveying to the members, he again mentions "our Product Development Project" in a subsequent memorandum to the members on August 7, 1998. (Exhibit P–16)

The overwhelming weight of the testimony convinces this court that Slagter occupied a fiduciary relationship to Stonecraft and, as such, owed fiduciary duties to Stonecraft. Many of the six factors, extracted from the cases cited hereinabove, are present when one examines the relationship that existed between Slagter and Stonecraft. These factors obviously include the duty not to mislead the other company members, as well as, the duty not to usurp Stonecraft's corporate opportunity by asserting control of a patent, largely developed by Stonecraft, to the detriment of Stonecraft. While these reasons could, standing alone, mandate a decision by this court that the patent be assigned by Slagter to Stonecraft, there is much more to support this conclusion.

## V.

## DISCUSSION OF CONCEPTION AND REDUCTION TO PRACTICE

Another issue to be determined is when the invention actually came into being, recognizing that the act of invention includes the two basic steps of (1) conception and (2) reduction to practice.

Slagter contends that the invention had met both of the steps prior to the time that he came to Stonecraft. As such, he argues that the fiduciary relationship issue is meaningless. For the reasons discussed below, the court disagrees with Slagter's position.

Without doubt, Slagter conceptualized the idea of a high latex cement composite.

He even created samples while experimenting in his father's garage. (Parenthetically, his father's construction. company had utilized latex as an ingredient in cement composites for bridge construction projects, although in much lower proportions.)

In his post-trial brief, Slagter states that in order to "reduce to practice" there must be a showing that the invention has *utility*. He cites *Wiesner v. Weigert,* 666 F.2d 582, 588, 212 USPQ 721, 726–727, (C.C.P.A. 1981); *Gross v. General Motors Corp.,* 521 F.2d 45, 49, 186 USPQ 433, 434–435 (1st Cir.1975), and *Randolph v. Shoberg,* 590 F.2d 923, 926, 200 USPQ 647, 649–650 (C.C.P.A.1979). The court could not agree more with this proposition. However, the court would add, that from the trial testimony, it was glaringly apparent that what Slagter had produced before coming to Stonecraft had *no utility* at all. There was no evidence introduced at trial indicating that Slagter's garage produced samples were even similar to the composite described in the patent application submitted on March 19, 1999.

When Slagter joined Stonecraft in 1995, his idea, even though he had produced tangible samples, was only an idea. The initial concept, presented to the Stonecraft investors, was to develop a fiber reinforced cement product utilizing the extrusion licensing authority from the Advanced Cement Based Materials Center at Northwestern University. Slagter needed the investors to commence production activities. He did not have the resources to begin on his own. Had he thought the polymer cement composite concept was a better, more viable approach, he would have attempted to "push" its development from the outset rather than the fiber reinforced product. This convinces this court that Slagter, as he stated in his own words, had only "played around" with latex as a

high content component for a cement product before he joined Stonecraft in 1995. (Slagter deposition, August 20, 2001, page 38, and Slagter 2004 deposition, page 32.) There was certainly much more to be done before Slagter's germ of an idea could be "reduced to practice" as a legitimate invention.

A significant case, offering insightful comments on the concept of "reduction to practice" is *Estee Lauder, Inc. v. L'Oreal, S.A.,* 129 F.3d 588 (Fed.Cir. 1997), where the court stated the following, to-wit:

> To prove actual reduction to practice, an inventor must establish that he " 'actually prepared the composition and knew it would work.' " *Hahn v. Wong,* 892 F.2d 1028, 1032, 13 USPQ2d 1313, 1317 (Fed. Cir.1989) (quoting *Mikus v. Wachtel,* 542 F.2d 1157, 1159, 191 USPQ 571, 573 (CCPA 1976)); see also *Burroughs Wellcome Co. v. Barr Lab., Inc.,* 40 F.3d 1223, 1228, 32 USPQ2d 1915, 1919 (Fed. Cir.1994) (reduction to practice requires "the *discovery* that an invention actually works" (emphasis added)); *see also Standard Oil Co. (Indiana) v. Montedison, S.p.A.,* 494 F.Supp. 370, 206 USPQ 676 (D.Del.1980), aff'd, 664 F.2d 356, 212 USPQ 327 (3d Cir.1981) (reduction to practice requires a showing of three elements: (i) production of a composition of matter satisfying the limitations of the count, (ii) recognition of the composition of matter, and (iii) recognition of a specific practical utility for the composition.)

*Id.* at p. 592.

> "It is well-settled that conception and reduction to practice cannot be established nunc pro tunc. There must be *contemporaneous recognition and appreciation* of the invention represented by the counts." *Breen v. Henshaw,* 472 F.2d 1398, 1401, 176 USPQ 519, 521

(CCPA 1973) (emphasis added)(holding no reduction to practice during lab experiments because there was no "indication in the contemporaneous record" that utility "was recognized *at that time*" (emphasis added)).

*Id.* at p. 593, 594.

As the court noted earlier, Slagter's early samples had no discernible utility.

In a chemical composite, the ratios of the ingredients utilized and the unique characteristics of the specific ingredients, actually included in the mix, are critically important. This is consistent with the deposition testimony of Louis A. Kuhlmann and Kenneth Meath, as well as, the "in court" testimony of patent attorney Benita Rohm, all offered by Slagter.

As mentioned hereinabove, once Slagter realized that the fiber reinforced cement composite could not be effectively produced, he shifted Stonecraft's focus to the polymer cement composite. This occurred during the latter part of 1997, when Kenneth Meath, who had been employed by Slagter as a consultant, was working at Stonecraft. The status of the polymer cement composite was generically described by Meath in his notes of December 5, 1996 (Exhibit D–44), to-wit: "mix is high cement/high latex with fine aggregate. Formulation contains methocel so that (it) can be extruded . . ." The court surmises that "methocel" is the same ingredient as methyl cellulose or something similar thereto. Coincidentally, this is the ingredient that Dr. Dale DeFord subsequently eliminated from the composite because it retarded the curing process. Apparently, there was no appreciable development of the product from the date of Meath's note until Dr. DeFord began his experiments.

Dr. DeFord was hired by Slagter on February 3, 1998, as product manager, responsible for product development and quality. Slagter had met DeFord when DeFord was employed at the Center for Advanced Cement Based Materials at Northwestern University. An employment agreement, dated March 3, 1998 (Exhibit P–13), was executed by Slagter on behalf of Stonecraft, as was a Confidentiality Agreement, dated February 3, 1998. (Exhibit P9)

DeFord testified that when he came to Stonecraft, the emphasis had been on the development of the fiber reinforced cement product. Slagter told DeFord that he wanted to take a new approach to product development that would not necessitate the use of the Northwestern University license. DeFord indicated that there was practically no record keeping prior to his arrival, and that Stonecraft had no ability to commercially manufacture a product of any description.

DeFord mentioned that methyl cellulose, a plasticizer, was being utilized at Stonecraft, apparently to promote extrusion. However, this ingredient retarded the cement hydration and slowed the curing process which was being undertaken through the use of an autoclave. He indicated that there were two significant problems in curing the product with an autoclave: (1) efflorescence, a coloration concern, and (2) "pop-ups," bubbles that appeared on the surface that resulted in exterior cracks ranging from one-half inch to one inch in diameter.

From his experiments, DeFord developed the composite that actually became the subject matter of the patent application through the following innovations:

1. Through trial and error, he adjusted the calcia/silica ratios which eliminated the need for autoclave curing and enabled the cement to "set" more quickly.

2. He *eliminated* methyl cellulose as an ingredient since this retarded the

curing process. (As noted above, the court is of the opinion that this ingredient was *included* in Slagter's early samples.)

3. He included a precipitated silica which enhanced the shaping of the product. (The inclusion of *reactive* silica is an important part of the composite mix. It is primarily a combination of *precipitated* silica and *ground* silica. Although precipitated silica was being used at Stonecraft when DeFord arrived, significantly, Slagter had never utilized or experimented with precipitated silica before he came to Stonecraft. DeFord developed the appropriate ratio of precipitated silica to ground silica that would allow the composite to be produced economically and functionally. It was described in the patent as striking a balance between reactivity, cost and rheology.)

DeFord was the only person at Stonecraft working on adjusting the calcia/silica ratios. He developed the spreadsheet (Exhibit P11) and the computer program that was used to calculate the ratios.

Corroborating that DeFord's experiments modified and refined Slagter's basic idea, Stonecraft introduced several "batch sheets" which memorialized the experiments' data. The following are examples:

Batch Sheet No. 1, dated March 18, 1998 (Exhibit P12)—The data do not meet any of the claims reflected on the patent application; this was an early experiment prepared just after DeFord arrived at Stonecraft. This sheet is demonstrative that there had been little *effective* experimentation with or development of this material since Slagter's arrival in 1995.

Batch Sheet No. 18, dated March 23, 1998 (Exhibit P15)—This experiment was getting in the range of patent claims

No. 1, No. 32, and No. 33, but not No. 29. *DeFord testified that Slagter had not experimented in these ranges earlier.*

Batch Sheet No. 108, dated August 20, 1998 (Exhibit P17)—This was the first batch that was not cured by autoclaving; methyl cellulose had been eliminated; and the batch had been cured in eight days. It satisfied claim No. 23 of the patent application.

Batch Sheet No. 121, dated September 14, 1998 (Exhibit P18)—This batch was cured in six days and did not require autoclaving; it met all of the claims set forth in the patent application.

A draft patent application, executed on February 17, 1999 (Exhibit P23), was prepared exclusively by DeFord. DeFord delivered the patent application to Slagter who then submitted it to patent attorney, Benita Rohm. In her effort to complete the application, Rohm posed numerous questions to DeFord for assistance. (Exhibit P24) DeFord answered each of the questions and "fleshed out" his earlier diagrams with text explanations. (Exhibits P–25 and P–26) All of this information was returned to Rohm. Ironically, the bulk of the Provisional Patent Application, prepared and filed by Rohm on March 19, 1999, was identical to DeFord's draft application. (Compare Exhibit P23 to Exhibit P27)

DeFord was solely responsible for the experiments reflected on Exhibit P–15 and P–18 which met the claims set forth in the Provisional Patent Application. DeFord was told by Slagter to designate Slagter as the inventor on the draft application. DeFord did as he was told, but now has challenged this designation with the U.S. Patent and Trademark Office.

The patent application was initially not accepted by the U.S. Patent and Trademark Office. This necessitated the prepa-

ration of a Response to Office Action which was undertaken by Rohm for submission on September 27, 2002. (Exhibit P45) The information utilized in this response was compiled primarily from the data generated from DeFord's experiments. This court perceives that were it not for DeFord's work and his detailed records, the patent may never have been issued.

At trial, there was no testimony that Slagter was involved in DeFord's experiments, other than perhaps reporting the results to the other Stonecraft members. Coincidentally, on October 7, 1998, Slagter, as Managing Member, sent a memorandum to the other members (Exhibit P–19), which set forth the following:

*Product and Process*

We have completed work on the mix for the product and we do have a material that does not need to be autoclaved. We have been curing under a blanket at 110 degrees Fahrenheit for seven days. This is followed by a dry cure which pulls the water out of the product and allows the latex to develop its properties. The mix we use does not need a special rapid setting cement. We were able to get regular cement to set by adjusting the calcium to silica ratio. *This is the direct result of Dale's discoveries while we had him working at the University of Illinois.* (emphasis supplied)

The acknowledgment of "Dale's discoveries" in the aforementioned memorandum is a glaring, yet apparently candid, admission by Slagter that DeFord's work had contributed substantially to the development of the polymer cement composite. (Parenthetically, the court would observe that this memorandum was disseminated at a time when the relationship between Slagter and the other members was still at a high level.)

In the opinion of the court, DeFord configured the ingredient ratios and processes expressed in the patent application. This is conclusively evidenced by the batch sheet documentation. The refinement of the ratios with the addition and exclusion of specific ingredients is obvious. The data on batch sheet No. 1 is significantly different from the data on batch sheet No. 121, where all claims set forth in the patent application were met.

While DeFord's work did not provide a panacea to cure all of the mass production issues, it substantially modified Slagter's earlier efforts. To say that DeFord's experiments did not "reduce the invention to practice" is simply disingenuous.

This court is not called upon to determine whether DeFord should be labeled as a co-inventor on the subject patent, and, therefore, makes no decision in this regard. However, while the idea for this invention was "conceived" by Slagter, it was clearly "reduced to practice" by Stonecraft through the work of DeFord and 100% at the expense of Stonecraft.

The court would be remiss by not mentioning that Slagter was compensated initially for bringing his "intellectual property" to Stonecraft. In the Subscription Agreement and Investor Questionnaire, dated November 1, 1995 (Exhibit P3), there is the indication that the intellectual property was purchased for the sum of $85,000.00. In the Revised Subscription Agreement and Investor Questionnaire, dated August 1, 1996 (Exhibit P6), the amount was raised to $177,000.00. The increase was necessary to pay-off Slagter's earlier debts. As such, Slagter appears to have been compensated for his "idea."

## VI.

## *DISCUSSION OF SECOND AMENDED AND RESTATED OPERATING AGREEMENT*

Following a mediation that occurred in March, 2000, a Second Amended and Re-

stated Operating Agreement, dated April 6, 2000 (Exhibit P–33), was executed by Slagter and Stonecraft which contains the following paragraph:

12.07 *Merger and Modification.* This Agreement and the Related Agreements constitute the entire agreement between the parties with respect to the subject matter hereof, and any prior discussions, negotiations and agreements between the parties are merged herein. Except as provided in Article XI, no amendment or modification of this Agreement shall be enforceable except if in writing and signed by the party against whom enforcement is sought.

Slagter contends that since it was known at the time this agreement was executed that he was designated as the inventor on the patent, that the "merger language" controls the issue of the patent ownership since it was not otherwise specifically addressed in the agreement. As such, Slagter argues that contractually Stonecraft and the members have acquiesced that he is indeed the patent owner. To the contrary, the members assert that the issue of patent ownership was never addressed. They contend that from the outset, it was always understood that any products developed by Stonecraft would be owned by Stonecraft and protected by patents that Slagter would obtain.

The mind set of the members is completely understandable considering the many representations made by Slagter and particularly in view of a position taken by Slagter in a lawsuit that he initiated against DeFord on behalf of Stonecraft shortly after he terminated DeFord. This cause of action was filed in the Chancery Court of Warren County, Mississippi, and sought to enjoin DeFord from disclosing any proprietary information that he might have learned at Stonecraft. In the complaint, Slagter alleged, inter alia, that

*Stonecraft* was in the business of *inventing* and developing *polymer modified cement composite material.* (Exhibit P47) (emphasis supplied)

Kuyers testified that the first actual notice that he received asserting that Slagter claimed individual ownership of the patent to the exclusion of Stonecraft was the letter drafted by attorney Delbert Hoseman, dated September 21, 2000. (Exhibit P–39) Kuyers added that, since everyone thought that Stonecraft already owned the intellectual property, there was no need to cover this subject in the Second Amended and Restated Operating Agreement.

Slagter acknowledged at trial that the issue of patent ownership and/or its assignment to Stonecraft was not discussed during the aforesaid March, 2000, mediation. It likewise does not appear to be contemplated anywhere in the Second Amended and Restated Operating Agreement. Consequently, since there was no meeting of the minds relative to the ownership issue, it cannot be resolved or governed by the "merger and modification" clause set forth in the agreement.

The court also cannot ignore § 450.4407, MLLCA, which provides that the articles of organization and/or an operating agreement cannot eliminate or limit the liability of a manager for: (a) The receipt of a financial benefit to which the manager is not entitled.

Because Slagter owed fiduciary duties to Stonecraft and because he did not reduce the invention to practice, he is not entitled to retain the benefit of the patent.

## VII.

### DISCUSSION OF AFFIRMATIVE DEFENSE

Slagter asserts as an affirmative defense that he was wrongfully terminated by the

other members of Stonecraft. While he was clearly relieved of his managerial duties and terminated as the Managing Member, he was not completely driven away from Stonecraft. According to the testimony, he could have continued to draw his salary, he was offered the title of "founder," and he could and does retain his member interest. The question that must be answered is why did all of this happen "on the heels" of the execution of the aforementioned Second Amended and Restated Operating Agreement.

There were rumors as early as February, 2000, that Slagter had misused company funds to purchase personal assets, as well as, to pay for non-company related travel. While this appears to be unauthorized and perhaps even improper, the amounts involved do not seem exorbitant and could have been reimbursed without significant difficulty. The court does not believe that these events, standing alone, precipitated the decision to terminate Slagter as the company manager. These occurrences were just pieces of a much larger picture.

In addition to the foregoing, Slagter acknowledged that he used Stonecraft employees to perform work on a home that he purchased in Vicksburg, Mississippi. However, he offered an explanation for this activity, that is, the residence would be utilized to provide housing for the employees of an outside construction firm who were performing work for Stonecraft. Stonecraft would otherwise have had to provide lodging accommodations at its expense for these outside employees. The use of Slagter's residence for housing was to be offset as a rental charge against the expenses incurred by the Stonecraft employees who performed work on the residence. While there appears to have been a very loose agreement about this particular issue, the testimony was somewhat confusing. Regardless, the court does not perceive this issue to be the overriding cause of Slagter's being relieved of his managerial duties.

Slagter's relationship with Stonecraft in early 2000 had been ongoing for over four years. No products were being manufactured in a commercial manner. Slagter's ability to "deliver" as the Managing Member appeared to be in doubt insofar as the other members were concerned. During calendar year 1999, he began having difficulty in dealing with other managerial employees, particularly Jamison Goorman, a Certified Public Accountant who Slagter had recently hired, and John Fenske, who had been brought on board as a consultant by Milt Kuyers.

Laurie DeVries, who was hired by Slagter in October, 1998, as a colorist, testified that she was discouraged by Slagter from communicating with Stonecraft employees at the Rolling Fork, Mississippi, facility. She also testified that Slagter began to isolate himself from the other employees by remaining in seclusion in his office.

Slagter terminated DeFord in May, 1999, and also terminated a secretarial employee, Rhonda Boss, because she had not told Slagter that DeFord had interviewed for a job with another company. Slagter indicated that he felt that DeFord had betrayed him. As noted hereinabove, shortly thereafter, Slagter initiated the chancery court lawsuit against DeFord on behalf of Stonecraft.

Stonecraft's day to day operations were described by several witnesses as "dysfunctional." Slagter even used this terminology in his own testimony. Considering the overall flavor of the evidence presented at trial, the court believes that this is indeed an appropriate description. The relationship between Slagter and the other members appeared to "peak" in the Spring of 1999, but following the termination of

Dr. DeFord, this relationship began a "downward spiral" which ended with Slagter's termination slightly more than a year later. The court cannot speculate whether this deterioration was primarily caused by a heightened distrust of Slagter or by the undercapitalization of Stonecraft which also appears to be problematic.

There was testimony to the effect that the problems at Stonecraft were not all attributable to Slagter. Both Attorney Robert DeJong, who was employed to represent Slagter by Milt Kuyers, and his wife, Mary DeJong, who was employed as a Stonecraft consultant by Slagter, testified that they thought Slagter was treated unfairly. Considering all of the testimony, however, this was clearly the minority viewpoint.

A cause of action, very similar to the subject adversary proceeding, was initially filed by Stonecraft against Slagter in the Circuit Court of Kent County, Michigan. In his responsive pleadings, Slagter filed a counterclaim against Stonecraft asserting, inter alia, that he had been wrongfully terminated by Kuyers and the other Stonecraft members.

Slagter also filed a counterclaim in the current adversary proceeding, which was essentially premised on the following two factors:

1. That the court would conclude that Slagter would be required to transfer or assign the subject patent to Stonecraft.

2. That, thereafter, because of the alleged "willfully unfair and oppressive" conduct of the members in control that Slagter's fiduciary duty or implied contractual duty should be negated, thus relieving him of the requirement to transfer or assign the patent to Stonecraft.

This counterclaim was dismissed for the following reasons:

First, the court looked to § 450.4515, MLLCA, which provides as follows, to-wit:

§ 450.4515. Actions by members against managers or members in control; order for relief.

(1) A member of a limited liability company may bring an action in the circuit court of the county in which the limited liability company's principal place of business or registered office is located to establish that acts of the managers or members in control of the limited liability company are illegal or fraudulent or constitute willfully unfair and oppressive conduct toward the limited liability company or the member. If the member establishes grounds for relief, the circuit court may issue an order or grant relief as it considers appropriate, including, but not limited to, an order providing for any of the following:

(a) The dissolution and liquidation of the assets and business of the limited liability company.

(b) The cancellation or alteration of a provision in the articles of organization or in an operating agreement.

(c) The direction, alteration, or prohibition of an act of the limited liability company, or of members, managers, or other persons party to the action.

(d) The purchase at fair value of the member's interest in the limited liability company, either by the company or by the managers or other members responsible for the wrongful acts.

(e) An award of damages to the limited liability company or to the member. An action seeking an award of damages must be commenced within 3 years after the cause of action under this section has accrued or within 2 years after the member discovers or reasonably should have discovered the cause of action under this section, whichever occurs first.

(2) As used in this section, "willfully unfair and oppressive conduct" means a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the member as a member. The term does not include conduct or actions that are permitted by the articles of organization, an operating agreement, another agreement to which the member is a party, or a consistently applied written company policy or procedure.

Second, the court looked to § 450.4407(a), MLLCA, which provides as follows, to-wit:

§ 450.4407. Managers; eliminating or limiting liability; exceptions.

A provision in the articles of organization or an operating agreement may eliminate or limit the monetary liability of a manager to the limited liability company or its members for breach of any duty established in section 404, except that the provision does not eliminate or limit the liability of a manager for any of the following:

(a) The receipt of a financial benefit to which the manager is not entitled.

The court then pointed out that while § 450.4515, MLLCA, says that the court can grant whatever relief it considers appropriate, including, but not limited to, those remedies set forth in subparagraphs (a) through (e), the relief sought in Slagter's counterclaim conflicted with the policy provided in § 450.4407(a), MLLCA, as well as, specific provisions of the United States Bankruptcy Code.

Thereafter, the court explained that if it reached the conclusion that Slagter was required to transfer the patent to Stonecraft, the patent would become an asset of the bankruptcy estate. By law, it would then have to be dealt with in keeping with the distribution provisions of the Bankruptcy Code. This would be true even if Stonecraft were ordered to be dissolved and liquidated. In essence, while the counterclaim *might* set forth a viable cause of action for unfair and oppressive conduct, the underlying remedy, which would have been the surrender of a bankruptcy estate asset by the debtor to an otherwise unsecured creditor, whose claim was primarily focused against the individual members of the debtor, could not be maintained as a matter of law. No monetary damages were demanded from Stonecraft. The court dismissed the counterclaim from the subject adversary proceeding because the relief requested was simply inappropriate and impermissible.

The court acknowledged, however, that Slagter's claim could be maintained in the Circuit Court of Kent County, Michigan, pursuant to § 450.4515, MLLCA, but the underlying remedy or request for relief would necessarily have to be amended or modified.

■ For the same reasons discussed hereinabove, the court is of the opinion that the affirmative defense asserted by Slagter, i.e., his alleged wrongful termination and/or the inequitable conduct on the part of the other Stonecraft members, cannot be effectively raised to negate the decision of this court that Slagter must transfer the patent to Stonecraft. As noted above, Slagter's right to pursue his cause of action against the aforesaid members may be exercised in the state court proceeding. Insofar as this adversary proceeding is concerned, however, the affirmative defense is not well taken because the ultimate remedy is not sustainable as a matter of law. The court cannot disregard the Bankruptcy Code and divest the bankruptcy estate of an asset for the benefit of a single unsecured creditor even if the individual members of the debtor perpe-

trated an offensive and inequitable act by wrongfully terminating Slagter.

## VIII.

### CONCLUSION

For the reasons set forth hereinabove, the court hereby concludes as follows, to-wit:

1. Slagter occupied a fiduciary relationship to Stonecraft. As such, consistent with § 450.4404(5), MLLCA, he held as trustee for Stonecraft any benefit that he derived from the development of the subject composite and the related patent. Consequently, he shall be ordered to transfer the patent to Stonecraft, as well as, any interest that he might have in the Patent Cooperation Treaty Request and the international applications (PCTs).

2. The aforesaid conclusion is also premised on a finding by this court that the invention which is addressed by the subject patent was reduced to practice by Stonecraft, through the work of Dr. Dale DeFord, fully at the expense of Stonecraft.

3. The affirmative defense asserted by Slagter, i.e., his alleged wrongful termination and/or the inequitable conduct on the part of the other Stonecraft members, cannot be effectively raised to negate the decision of this court that Slagter must transfer the subject patent and the PCTs to Stonecraft. Slagter's right to pursue his cause of action against the aforesaid members may be exercised, without prejudice, in an appropriate state court of competent jurisdiction.

A separate order shall be entered consistent with this opinion.

This 7th day of March, 2005.